******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

STATE OF CONNECTICUT *v.* BRIAN J. SMITH
(AC 38103)
(AC 38104)
(AC 38105)

DiPentima, C. J., and Keller and Prescott, Js.

*Syllabus*

Convicted of the crimes of, inter alia, operating a motor vehicle while under the influence of intoxicating liquor or drugs and tampering with a witness, the defendant, who also was convicted of being a third time offender, appealed to this court. A state police trooper had observed the defendant's stationary vehicle in the travel lane of a road with its brake lights illuminated. When the trooper positioned his vehicle behind the defendant's vehicle, the trooper saw the defendant's brake lights go off and his parking lights go on. The trooper smelled burnt marijuana in the defendant's vehicle and, when he asked the defendant for his driver's license and the vehicle's registration, observed that the defendant's speech was slurred and that his eyes were bloodshot and glazed over. The trooper thereafter administered field sobriety tests, which the defendant failed. After the defendant was released from police custody, he engaged his girlfriend, K, and P and A, who were friends of K and who testified at trial, in a plan to create a false narrative of the events that led to his arrest so that he could claim that he had pulled over for safety and had not driven his automobile because it was inoperative when he encountered the trooper. After P changed her mind about participating in the defendant's plan, he sent her messages on Facebook in which he attempted to calm her and made various threats against her if she did not testify on his behalf. On appeal, the defendant claimed, inter alia, that the evidence was insufficient to support his conviction of operating a motor vehicle while under the influence of intoxicating liquor or drugs because it failed to show that he had operated his vehicle just prior to his encounter with the trooper. *Held*:

1. The evidence was sufficient to support the defendant's conviction of operating a motor vehicle while under the influence of intoxicating liquor or drugs, the state having presented sufficient evidence to prove beyond a reasonable doubt that the defendant operated a motor vehicle while he was intoxicated: contrary to the defendant's claim, there was ample evidence to support a finding that he had operated his vehicle just prior to the point in time that he encountered the trooper, as a written statement that the defendant provided to the police following his arrest permitted the jury to reasonably find that he had admitted that he pulled over for safety just prior to the trooper's arrival on the scene, the jury reasonably could have inferred that the defendant's explanation to K about the incident with the trooper reflected an implicit admission that he had been driving just prior to the time that he encountered the trooper, and it would have been reasonable for the jury to conclude from the trooper's testimony that he saw the defendant's parking lights go on when the brake lights went off, that the defendant had shifted the gears in the automobile with the key in the ignition, which contradicted the defendant's testimony that his vehicle had been disabled prior to his encounter with the trooper; moreover, the jury reasonably could have rejected as untruthful the defendant's testimony that the automobile was inoperable, as the state presented ample evidence that, following his arrest, the defendant engaged others to provide a false version of events concerning his operation of the automobile, and that evidence was highly probative of the fact that he had operated the vehicle just prior to his encounter with the trooper and of his consciousness of guilt for having operated the motor vehicle while under the influence.

2. The defendant could not prevail on his claim that the trial court improperly admitted into evidence a copy of a written Facebook message that he had sent to P in which he asked her to corroborate his version of the events that led to his arrest; the state satisfied its burden of authenticating the exhibit at issue because it presented sufficient evidence to sup-

port a finding that the evidence was what the state claimed it to be, namely, a Facebook message sent to P by the defendant, as P's personal knowledge of the defendant and the subject matter of the message, as well as the distinctive characteristics of the communication in light of the surrounding circumstances in which it was made, constituted sufficient circumstantial evidence of authenticity, the defendant had a full opportunity to expose to the jury what he believed were weaknesses in the evidence and to argue that it lacked probative value, and any error with respect to the admission of the written Facebook message was harmless, as the message was merely cumulative of other efforts made by the defendant to induce P to testify falsely.

Argued October 23, 2017—officially released February 20, 2018

*Procedural History*

Two part substitute information charging the defendant, in the first two cases, with the crimes of operating a motor vehicle while under the influence of intoxicating liquor or drugs, operating a motor vehicle with an elevated blood alcohol content and making a false statement in the second degree, and with possession of a small amount of a cannabis-type substance, and the infractions of improper parking and operating a motor vehicle without carrying an operator's license, and, in the second part, with having previously been convicted of operating a motor vehicle while under the influence, and substitute information in the third case, charging the defendant with two counts of the crime of tampering with a witness, brought to the Superior Court in the judicial district of Tolland, geographical area number nineteen, where the court, *Graham, J.*, granted the state's motion to consolidate the cases for trial; thereafter, the charges in the first and third cases of operating a motor vehicle while under the influence of intoxicating liquor or drugs, operating a motor vehicle with an elevated blood alcohol content, making a false statement in the second degree and tampering with a witness were tried to the jury before *Oliver, J.*; verdicts of guilty; subsequently, the charges in the first two cases of possession of a small amount of a cannabis-type substance, improper parking and operating a motor vehicle without carrying an operator's license were tried to the court, *Oliver, J.*; finding of guilty; thereafter, the defendant was presented to the court, *Oliver, J.*, on a plea of nolo contendere to the second part of the first information; judgment of guilty; subsequently, the court, *Oliver, J.*, vacated the verdict of guilty of operating a motor vehicle with an elevated blood alcohol content; judgments of guilty, from which the defendant filed separate appeals with this court; thereafter, this court consolidated the appeals. *Affirmed.*

*Jennifer B. Smith*, assigned counsel, for the appellant (defendant).

*Timothy F. Costello*, assistant state's attorney, with whom, on the brief, were *Matthew C. Gedansky*, state's attorney, and *Charles W. Johnson*, assistant state's attorney, for the appellee (state).

*Opinion*

KELLER, J. In these consolidated appeals,[1] the defendant, Brian J. Smith, appeals from the judgments of conviction, rendered following a jury trial, of operating a motor vehicle while under the influence of intoxicating liquor or any drug in violation of General Statutes § 14-227a (a) (1), and tampering with a witness in violation of General Statutes § 53a-151 (a). The defendant claims that (1) the evidence was insufficient to convict him of operating a motor vehicle while under the influence of intoxicating liquor or any drug and (2) the court erroneously admitted certain evidence relating to the witness tampering count. We affirm the judgments of the trial court.

The jury reasonably could have found the following facts. At approximately 1:50 a.m. on March 7, 2014, James Grimes, a state police trooper, was patrolling near the intersection of Route 44 and Route 195 in Manchester when he observed a stationary motor vehicle in the eastbound travel lane of Route 320, which intersects with Route 195 a short distance from the intersection of Route 44 and Route 195. The motor vehicle, a tan colored Volvo, was impeding travel. Grimes observed the vehicle for a few minutes and saw that the vehicle's brake lights were on and that the vehicle remained stationary.

Grimes positioned his police cruiser behind the stationary vehicle and activated his vehicle's emergency lights. At that time, he observed that "the brake lights [on the stationary vehicle] went off because you could see the parking lights go on as the vehicle was shifted into park." Grimes exited his cruiser and knocked on the passenger window. The sole occupant and operator of the vehicle, the defendant, rolled down the passenger window. Immediately, Grimes smelled burnt marijuana. Grimes asked the defendant "what was going on," to which the defendant replied, "I'm just stopped," and that he was trying to use his cell phone. Grimes, after concluding that the defendant was not experiencing a medical issue and that there were not any mechanical issues with the vehicle, told him that he could have chosen a more suitable location. Grimes then asked the defendant for his driver's license and his vehicle's registration. The defendant, however, did not have his driver's license with him.

While the defendant was searching for his license and registration, Grimes asked him several questions to gauge whether he was impaired. Grimes observed that the defendant's speech was slurred and that his eyes were bloodshot and "glazed over . . . ." The defendant's responses were "kind of slow and kind of spacy," and the defendant was "struggling" to understand or was not fully engaged in the conversation. For example, the defendant first told Grimes that he was

traveling from Willimantic, but then told Grimes that he was coming from his place of employment at a restaurant in Waterford.

Grimes walked to the driver's side of the defendant's vehicle and the defendant complied with his request to roll down the window. Grimes smelled not just burnt marijuana, but also alcohol. Grimes asked the defendant if he had been drinking or smoking marijuana, and the defendant denied that he had used either substance.

Grimes then asked the defendant, who was still in the vehicle, to complete two tests to gauge his sobriety and coordination. The defendant was asked to recite specified portions of the alphabet and to complete a "finger dexterity test" that required him to count aloud while touching each of his fingertips with his thumb. The defendant failed these tests.

Grimes returned to his cruiser to inform his dispatcher that he was going to administer standardized field sobriety tests to the defendant. When he walked in the direction of the defendant's vehicle, he observed the defendant quickly "shoving" candy into his mouth. In Grimes' experience, "this was a way for people that are driving under the influence to try and mask their breath or try to get something in their system that's going to dilute the alcohol concentration in their system." Grimes instructed him to stop.

At Grimes' direction, the defendant exited the vehicle. He moved slowly and kept his right hand closed. Grimes ordered him to open his hands and to keep them raised, but the defendant did not comply fully as he continued to keep his right hand closed. Grimes opened the defendant's hand to reveal a small brown pipe. The pipe, like the defendant's vehicle, smelled like burnt marijuana. The pipe contained marijuana residue.

Grimes then administered three standard field sobriety tests, including the horizontal gaze nystagmus test, the walk and turn test, and the one leg stand test. The defendant failed all of these tests.

At 2:10 a.m., Grimes arrested the defendant after which the defendant was handcuffed, seated in the police cruiser, and transported to the state police barracks for Troop C in Tolland. After Grimes advised the defendant of his *Miranda* rights,[2] the defendant pleaded with Grimes to let him go because "he didn't need this," and that he was worried about losing his job. He stated that "he just was going to see this girl and just wanted to . . . sleep it off . . . ."

At the state police barracks, Grimes searched the defendant's clothing. In a pocket of the defendant's jacket, he discovered a cigar holder containing marijuana. Grimes requested that the defendant submit to a breath test. He advised the defendant of his rights in this regard, as well as the significance of a refusal to submit to the test.[3] The defendant then spoke with his

attorney by telephone.

Grimes asked the defendant for his decision with respect to the breath test. The defendant stated that he wanted to talk to his attorney again. Grimes informed the defendant that his indecision constituted a refusal to submit to the test. Grimes summoned another state police trooper, Jonathan Neihengen, to the processing room. At that time, Neihengen witnessed the defendant's failure to cooperate with respect to the test, which constituted his refusal. Grimes again permitted the defendant an opportunity to use the telephone to inform his attorney that he had refused to submit to the test.

As the defendant turned to use the telephone, he inserted a candy or a breath mint into his mouth. Earlier, while Grimes was transporting the defendant to the state police barracks, one of the things he discussed with the defendant was that he could not have anything to eat or drink until after he had completed the test. When Grimes informed the defendant that his conduct, which included eating candy, amounted to a refusal to submit to a breath test, the defendant replied that he had sustained injuries to his wrists as a result of the handcuffs and that he wanted medical treatment at a hospital. Emergency medical personnel arrived on the scene, but they declined to transport him to the hospital to treat what they considered to be an "extremely minor" abrasion. When Grimes told the defendant that he would not be going to the hospital, he then complained for the first time that he wanted to go to the hospital because he was experiencing heart problems and trouble breathing. The defendant's outward appearance was normal, yet, on the basis of the defendant's new complaints, the emergency medical personnel at the scene made the decision to transport the defendant to Rockville General Hospital for examination.

Despite the fact that Grimes already had recorded the defendant's refusal to submit to a breath test, a state police sergeant, Craig Jones, afforded the defendant yet another opportunity to submit to a breath test. The defendant declined this request, but stated that he would provide a blood sample once he was at the hospital. Grimes accompanied the defendant to the hospital. Upon his arrival, the defendant informed hospital staff that he was experiencing chest pains and palpitations. Hospital staff detected an alcohol-like odor being emitted from the defendant. When hospital staff asked to perform an electrocardiogram and lab work, the defendant immediately replied that he needed to speak with his attorney, his pain had subsided, and he was feeling better since his arrival at the hospital. After speaking with his attorney, the defendant told hospital staff that he would submit to an electrocardiogram test and provide a urine sample, but he stated that he would not submit to a blood test because he was afraid of needles.

Ultimately, at 5:08 a.m., more than three hours after Grimes first encountered the defendant, the defendant provided a blood sample to hospital staff. The defendant's urine sample tested positive for marijuana use, his blood sample reflected a blood alcohol content of 0.10 percent,[4] and the result of his electrocardiogram test was normal. By 6 a.m., the defendant had been discharged from the hospital because he was not suffering from any health issues, and he was returned to the state police barracks. The defendant then gave the police a written statement in which he admitted that when Grimes came upon him earlier that morning, he had pulled his automobile "over for safety" and was attempting to complete a telephone call. After the police completed processing the defendant, he was issued a summons to appear in court and was released from police custody.

The defendant called his girlfriend at that time, Lena Knowles, from the police barracks because he needed to be picked up. Later that day, he stated to her that he was arrested for driving under the influence of alcohol and that he had, in fact, consumed a couple glasses of wine. The defendant stated to her, however, that he had a plan to deal with his arrest because, if he was convicted, he would be separated from his son. Specifically, he planned on claiming that he had not driven his automobile. He asked Knowles to relate the following facts to law enforcement: she had been driving the defendant's automobile on March 6, 2014, while she was out with friends. Meanwhile, the defendant was at home with Knowles' children. A friend of Knowles, Kelly Aston, was following Knowles home when the defendant's automobile began "acting funny . . . ." Knowles pulled over the disabled automobile, and Aston drove her home. Later that night, Knowles drove the defendant to the disabled automobile and left him with the automobile so that he could call for roadside assistance. After Knowles departed, the police encountered the defendant in the automobile.

Despite the fact that no aspect of this story was accurate, Knowles indicated to the defendant that she would relate these facts to the authorities on his behalf because she felt sorry for him. The defendant told Knowles that he had spoken with Aston, who had agreed to corroborate this version of events, and asked Knowles to persuade another friend of hers, Danielle Petsa, to corroborate this version of events.

Later that day, at Knowles' residence, the defendant spoke with Aston. He told her about the circumstances of his arrest, specifically, that he had consumed wine at his place of employment, began driving to Knowles' residence, and "was pulled over" on the road when the police found him in his automobile. The defendant told Aston the version of events that he had fabricated and, initially, Aston agreed to "go along" with the defendant's

story. Subsequently, she spoke with an investigator working for the defendant's attorney and made statements that were consistent with the defendant's false version of events. After speaking with family members about the matter, however, Aston decided that she would not make any further false statements concerning the incident because she was not comfortable doing something that could get her into trouble with law enforcement.

Soon after the incident, Knowles called Petsa on the telephone and invited her to her residence to discuss the defendant's plan. Petsa met with the defendant and Knowles at Knowles' residence. The defendant and Knowles discussed the details of her providing information to law enforcement on the defendant's behalf in accordance with his plan. When Petsa was contacted by an inspector working for the defendant's attorney, however, she had difficulty providing facts that were consistent with the defendant's version of events. She had second thoughts about participating in the defendant's plan, experienced panic attacks, and ultimately decided that she would not provide a false statement. In a second conversation with the investigator, she told him that she would not be involved with this any longer and would not "cover" for the defendant.

When the defendant learned that Petsa was apprehensive about providing false statements to the investigator and had difficulty doing so, he communicated with her on Facebook in an attempt to calm her and assure her that she could do what he had asked of her. Later, when the defendant learned from Knowles that Petsa would not provide the information that he wanted her to provide, he sent her one or more messages on Facebook in which he stated, among other things, that if she did not testify on his behalf, he would tell the police that she drives with her children in an unregistered automobile and that he would tell the wife of a married man with whom she was having an affair about the affair.[5] Additional facts will be set forth in our analysis of the defendant's claims.

I

First, the defendant claims that the evidence was insufficient to convict him of operating a motor vehicle while under the influence of intoxicating liquor or any drug. We disagree.

To sustain a conviction under § 14-227a (a) (1), the state bore the burden of proving beyond a reasonable doubt that (1) the defendant operated a motor vehicle and (2) that he did so while under the influence of an intoxicating liquor. The defendant does not argue that the evidence did not support a finding that he was intoxicated when Grimes encountered him in the early morning of March 7, 2014. As he did before the trial court,[6] the defendant argues that the state did not pre-

sent sufficient evidence to demonstrate that he had operated a motor vehicle at or near the time that he encountered Grimes.

"The standard of review we apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . .

"Finally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Crespo*, 317 Conn. 1, 16–17, 115 A.3d 447 (2015).

Focusing on the essential element of operation of a motor vehicle as used in § 14-227a (a) (1), we observe that although evidence of driving readily proves that operation occurred, the state may prove that operation

occurred other than by proof of driving. "Nothing in our definition of 'operation' requires the vehicle to be in motion or its motor to be running." *State* v. *Haight*, 279 Conn. 546, 552, 903 A.2d 217 (2006). "It is well settled that operating encompasses a broader range of conduct than does driving. . . . [T]here is no requirement that the fact of operation be established by direct evidence." (Citation omitted; internal quotation marks omitted.) *State* v. *Sienkiewicz*, 162 Conn. App. 407, 410, 131 A.3d 1222, cert. denied, 320 Conn. 924, 134 A.3d 621 (2016). "Operation occurs when a person in the vehicle intentionally does any act or makes use of any mechanical or electrical agency which alone or in sequence will set in motion the motive power of the vehicle. . . . This court has clarified the meaning of operation by holding that an intent to drive is not an element of operation. . . . An accused operates a motor vehicle within the meaning of . . . § 14-227a (a) when, while under the influence of alcohol or any drug and while in the vehicle and in a position to control its movements, he manipulates, for any purpose, the machinery of the motor or any other machinery manipulable from the driver's position that affects or could affect the vehicle's movement, whether the accused moves the vehicle or not." (Internal quotation marks omitted.) *State* v. *Roth*, 104 Conn. App. 248, 251 n.3, 932 A.2d 1071 (2007); see also *State* v. *Wiggs*, 60 Conn. App. 551, 554, 760 A.2d 148 (2000).

In his assessment of the evidence, the defendant relies heavily on his trial testimony. Notably, the defendant testified that that his automobile was inoperable at the time that Grimes came upon him and that he had not driven the vehicle before it became inoperable. The defendant testified to the following version of events: He was driving to Knowles' residence at approximately 7 p.m. on March 6, 2014, when his automobile experienced problems of an electrical or mechanical nature that were related to a continuously running fan. He pulled to the side of the road and removed the key from the ignition. He called Aston for a ride. Aston drove the defendant to a bar where he and Aston smoked marijuana. At a second bar, the defendant consumed alcohol for the first time that evening. At approximately 1 a.m., on March 7, 2014, Aston drove the defendant back to his disabled automobile and left immediately after dropping him off.[7] When he was back inside of his automobile, he began searching for his roadside assistance card. This is when Grimes approached him. It was only *after* Grimes walked to his automobile and instructed him to roll down his window that he retrieved his key from his jacket, inserted the key into the ignition, and turned the ignition to the "on" position so that he could lower the window. According to the defendant, the automobile had enough battery power to lower the window, but not enough battery power "to power up the vehicle." The defendant testified that he never

attempted to induce Knowles, Aston, or Petsa to make a false statement to help him in connection with the present case.

Relying on his testimony that the automobile was inoperable,[8] as well as the fact that Grimes did not observe the automobile in motion, the defendant argues that operation could not have occurred in the present case. The defendant cites precedent standing for the proposition that an automobile that is totally disabled or incapable of movement cannot be said to have been operated. See, e.g., *State* v. *Cyr*, 291 Conn. 49, 60, 967 A.2d 32 (2009); *State* v. *Swift*, 125 Conn. 399, 404, 6 A.2d 359 (1939).

The defendant's analysis of the claim is flawed because, in arguing that the evidence was insufficient to support a finding that he operated the automobile, he disregards ample evidence that supported a finding that he had operated the vehicle just prior to the point in time that Grimes arrested him. In our role as a reviewing court, we are bound to examine the evidence in the light most favorable to the jury's finding of guilt. *State* v. *Crespo*, supra, 317 Conn. 16. The evidence included the written statement that the defendant provided to the police following his arrest. Therein, the defendant stated in relevant part that "[o]n [March 7, 2014,] at about 1:30 [a.m.,] I was stopped along [Route 195] near the four corners and CVS in Willington, CT. I was attempting to make a phone call and had pulled over for safety. A [s]tate [t]rooper then pulled in behind my car and came up to the passenger side of my car and asked for my paperwork." The jury, exercising common sense in its evaluation of the evidence, reasonably could have found that, when the defendant provided this explanation to the police to explain what had occurred when the police found his automobile obstructing traffic, he admitted that he had "pulled over for safety" just prior to Grimes' arrival on the scene. At trial, the defendant testified that several events took place between the time of operation and the time that he encountered Grimes. Yet, the jury reasonably could have inferred that the omission of these events from the defendant's statement suggested that his testimony was not true. A rational interpretation of the statement reflects that the defendant's conduct in pulling over was occasioned by and occurred contemporaneously with his attempt to make a telephone call.[9]

Consistent with the defendant's written statement was Aston's testimony that the defendant told her that, prior to Grimes' arrival, he had consumed wine at his place of employment, began to drive to Knowles' residence upon leaving work, and pulled his automobile over for some reason. He was pulled over when Grimes came upon him. The jury reasonably could have interpreted the evidence of the defendant's candid explanation to Aston in the same manner that it reasonably

could have interpreted the defendant's statement to the police, namely, as evidence of an implicit admission by the defendant that he had operated his automobile just prior to his encounter with Grimes. Moreover, Knowles testified that when she discussed the incident with the defendant upon his release from police custody, he revealed to her that "he had been pulled over and that he was arrested," and that "[h]e said he had a couple of glasses of wine." Nothing in this explanation remotely suggests that the myriad of events detailed by the defendant in his trial testimony occurred between the time that he ceased operating the automobile and the time that Grimes came upon the scene. Additionally, the defendant stated that he "had a plan to say that he hadn't been driving," which included Knowles, Petsa and Aston corroborating a false version of events. In light of the evidence viewed in its entirety, the jury reasonably could have inferred that the defendant's explanation to Knowles reflected an implicit admission by the defendant that, in fact, he had been driving just prior to the time that he encountered Grimes.

Further supporting a finding that the defendant had operated his automobile just prior to his encounter with Grimes was Grimes' testimony that when he first observed the defendant's automobile, it was parked in the middle of the roadway with its brake lights illuminated. Grimes testified that he stopped behind the defendant's automobile and activated his emergency lights, at which time "the brake lights went off because you could see the parking lights go on as the vehicle was shifted into park."[10] It would have been reasonable for the jury to have concluded that this evidence, which suggested that the defendant had shifted the gears in the automobile with the key in the ignition, plainly contradicted his testimony that, when Aston returned him to the automobile, he merely was in the process of looking for his roadside assistance card.

The defendant testified that he had turned off the motor of his automobile and removed the key from the ignition because a display inside of the automobile warned him of the potential for irreversible damage. Although he denied having driven the automobile just prior to his encounter with Grimes, the defendant acknowledged that, after Aston returned him to his automobile and Grimes arrived on the scene, he inserted his key into the ignition and turned the key so that he could lower his window. The defendant stated that he did so because Grimes had knocked on the window and motioned for him to lower it.

The defendant does not dispute that a finding that he drove the automobile was sufficient to demonstrate operation, and that relevant precedent reflects that the act of inserting the key into the ignition and turning the key within the ignition of an operable motor vehicle is sufficient to demonstrate that a defendant has oper-

ated it. See, e.g., *State* v. *Haight*, supra, 279 Conn. 553; *State* v. *Bereis*, 117 Conn. App. 360, 366–67, 978 A.2d 1122 (2009); *State* v. *Clausen*, 102 Conn. App. 241, 244, 925 A.2d 372 (2007). The defendant rebuts the evidence of operation by focusing on the evidence that he presented to demonstrate that the automobile was inoperable. The jury, having carefully considered the evidence in its entirety, reasonably could have relied on the evidence that the defendant had operated the automobile and reasonably could have rejected as untruthful the defendant's testimony that his automobile was inoperable. Moreover, the state presented ample evidence that, following his arrest, the defendant engaged others to provide a false version of events concerning his operation of the automobile. The evidence presented by the state to demonstrate that the defendant tampered with witnesses was highly probative of the fact that he had operated the vehicle just prior to his encounter with Grimes and of the defendant's consciousness of guilt for having operated a motor vehicle while under the influence. These facts supported the jury's reliance on the state's evidence and theory of the case.

In light of the foregoing, we conclude that the state presented sufficient evidence to prove beyond a reasonable doubt that the defendant operated a motor vehicle while he was intoxicated. Accordingly, we reject the defendant's claim.

II

Next, the defendant claims that the court erroneously admitted certain evidence relating to one of the tampering with a witness counts. See footnote 1 of this opinion. We disagree.

During its case-in-chief, the state presented testimony from Petsa about how she was asked to corroborate the defendant's version of events leading up to his arrest. Petsa testified that, initially, Knowles called her on the telephone and asked her to corroborate "a story that would help keep [the defendant] from getting in trouble."[11] Petsa testified that she then met with Knowles and the defendant at Knowles' residence, and that "[t]he conversation" centered around a false narrative of the events leading up to the defendant's arrest. Petsa testified that, after Knowles and the defendant discussed the plan with her, she did not discuss the plan with either of them until after she spoke with an investigator working on behalf of the defendant's attorney. At that time, she decided that she did not want to get into trouble for making a false statement to law enforcement. Petsa testified that she spoke with an investigator working on behalf of defense counsel, but she was told that the defense did not intend to rely on her because her answers "didn't match what the other people were saying." Thereafter, she spoke with her friend, Knowles, to let her know that she was experiencing panic attacks and did not want to be involved

with the defendant's plan.

Petsa testified: "Once [the defendant] found out that I was having panic attacks and stuff like that about it, he tried reaching out to me on Facebook and messaging me on Facebook. You know, kind of some of the first ones were, like, you know, you can handle this; you know, just keep it calm and everything else like that, and then when he found out I wasn't going to back up his story, I started getting messages and, like, pages upon pages of stuff from him saying that he was going to call the state police on me and tell them that I'm driving [without a license or registration] with my kids in the car . . . and if I don't testify on his behalf, then he's going to call the state police and let them know where I drive and all that kind of stuff to get me caught." Petsa testified that, through her relationship with Knowles, the defendant knew that she was having an affair with a married man and that, in an eight page message on Facebook, he also threatened both her and the man by "saying that he was going to rat him out to his wife" if Petsa did not cooperate. Petsa testified that "[a]ny messages on Facebook from [the defendant] were definitely after I talked to the investigator."

The prosecutor showed Petsa a document marked for identification purposes. Petsa stated that it was an excerpt from one of the Facebook messages that she had received from the defendant and that she had provided it to the prosecutor. She stated that she knew it was from the defendant "[b]ecause it comes in from my Facebook and it says who it comes from on Facebook." Petsa stated that the defendant's name appeared at the top of the message because "[i]t prints out automatically from the Internet."

The state offered the Facebook message as a full exhibit on the ground that it was a statement made by a party opponent, the defendant. The court excused the jury after defense counsel objected to the admission of the exhibit. Defense counsel argued that the state had not authenticated the exhibit because the state failed to prove that it came from the defendant's Facebook account or that it was his message.

The prosecutor conducted a voir dire examination of Petsa in an attempt to provide a more complete foundation for the proffered exhibit. Petsa testified that she had a Facebook account for a couple of years and that the defendant was not blocked from her Facebook page. She testified that the exhibit at issue was part of a series of messages that the defendant sent to her on Facebook. In this series of messages, the defendant threatened to expose Petsa's affair with a married man, discussed a baseball team on which Petsa and Knowles played, and discussed the role that Petsa played in the demise of the defendant's relationship with Knowles. Petsa testified that all of the messages she had received from the defendant made sense to her in light of her

relationship with him and with Knowles. She testified that she did not have any reason to believe that the message at issue did not originate from the defendant. She testified: "I knew it came from [the defendant]. . . . Just from meeting [the defendant] and knowing how he talks and how he, like, lays himself out there, that definitely was a message from [the defendant]."

Defense counsel argued that the state failed to satisfy its burden of authenticating the message because it failed to prove that the defendant sent it. Defense counsel suggested that anyone could have sent the message by using the defendant's Facebook account and that Petsa, familiar with the defendant's manner of speaking, could have manufactured the message at issue. The prosecutor argued that, in accordance with § 9-1 of the Code of Evidence, the state had presented sufficient evidence, in the form of Petsa's testimony, for the finder of fact to determine that the evidence was what it was purported to be, namely, a message sent to Petsa from the defendant. The prosecutor disagreed that any additional proof, such as testimony from a Facebook employee, was required to demonstrate that the message was authentic.

The court asked Petsa for additional information with respect to how the message had been printed because, in the court's opinion, the message appeared to be typewritten on plain white paper and was not similar in appearance to other "print-offs from Facebook" with which the court apparently was familiar. In response, Petsa testified that, earlier that month, she was in the prosecutor's office and had printed the message by copying it from her Facebook account and pasting it into a computer program known as "Word" so that she could print it. She stated that "we had an issue with [it] at the office at that time . . . trying to print it from Facebook directly whereas we copied and pasted from [the defendant's] message to put it into Word so that I could print it for [the prosecutor], but if you were to . . . allow me to log onto my Facebook [account], you could see all that directly under his messages."

The court, stating that it had reviewed the relevant evidentiary rule, ruled as follows: "Based on the content of the writing and the testimony of this witness with the surrounding circumstances, it meets the threshold to be sufficiently put before the jury and to leave to them with cross-examination and rebuttal testimony how much weight they give to it based on the credibility of this witness, other witnesses in support of this . . . plan. So the objection is overruled . . . ."

Thereafter, in the presence of the jury, the prosecutor asked Petsa about the exhibit, as follows:

"Q. Ms. Petsa, is state's [exhibit] 20, which is now a full exhibit, part of a series of Facebook messages that you printed out for me?

"A. Yes.

"Q. Was I in your presence when you printed those out?

"A. Yes.

"Q. And did you actually do that on the computer in my office?

"A. Yes.

"Q. Was that shortly after I learned that those messages existed?

"A. Yes.

"Q. Did you alter any text in those messages in any way?

"A. None at all."

The prosecutor published the exhibit for the jury by reading it aloud. The exhibit, which bears a date of May 29, a time of 11:55 p.m., and the defendant's name, states in relevant part: "Danielle, please give me a call before you call my [l]awyer's [i]nvestigator back tomorrow. Lena told me that, you had a mini panic attack & didn't answer any of his questions today, now you were worried he is suspect. I have dealt with this investigator before & there is absolutely nothing for you to be stressed or have panic about. Your statement in this is so small & I want you to call him & insist that, he either take your statement over the phone, or he drive to you because, you just can't get down there. You are a [w]itness Dani, not the 1 on [t]rial. I'll be the 1 on [t]rial, if it goes that far. He works for my [l]awyer & his job is 2 things. His job is to gather evidence for my [l]awyer so, we don't have to go to [t]rial because, my [w]itnesses are so solid that, [t]rial could possibly be avoided. He is also prepping you for [t]rial, in case I do have to go to [t]rial. I know you got nervous but, don't be. Call Lena in the morning & do what her & Kelly did. Write down everything she tells you to write down so, you can have the answers in front of you on paper so, you won't get nervous. I want to give you a positive pep talk & ask you the questions I think he might ask, to prep you for your call with him, after you've talked to Lena & before you call the [i]nvestigator. So, call me on my cell in the morning. You didn't blow it. We just have to get you ready so, you are confident, like you always are & like Lena & Kelly were, when they talked to him. Call Lena, take notes, then call me before you call him. We got this & thank you for having my back with this. You, Kelly & Lena are really saving my hide with this & I appreciate it more than I could ever tell you. The 3 of you will have my loyalty for life for this. Talk to you in the morning. . . . Goodnight"

As he did at trial, the defendant argues on appeal that the state failed to authenticate the written Facebook message presented to the jury[12] by presenting sufficient

evidence to demonstrate that he authored the message reflected therein.[13] In this vein, the defendant argues that (1) it was not sufficient for the state to demonstrate that the message originated from the defendant's Facebook account; (2) Petsa's testimony concerning other messages that Petsa believed had been sent to her by the defendant was insufficient to demonstrate that he authored the message at issue; (3) the message at issue did not contain information to suggest that it could only have originated with him; and (4) the evidence suggested that it was *possible* that Knowles could have accessed the defendant's Facebook account and sent the message.

"We review the trial court's decision to admit evidence, if premised on a correct view of the law . . . for an abuse of discretion." *State* v. *Saucier*, 283 Conn. 207, 218, 926 A.2d 633 (2007). "It is axiomatic that [t]he trial court's ruling on the admissibility of evidence is entitled to great deference. . . . In this regard, the trial court is vested with wide discretion in determining the admissibility of evidence . . . . Accordingly, [t]he trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . Furthermore, [i]n determining whether there has been an abuse of discretion, every reasonable presumption should be made in favor of the correctness of the trial court's ruling, and we will upset that ruling only for a manifest abuse of discretion. . . . Even when a trial court's evidentiary ruling is deemed to be improper, we must determine whether that ruling was so harmful as to require a new trial. . . . In other words, an evidentiary ruling will result in a new trial only if the ruling was both wrong and harmful." (Citation omitted; internal quotation marks omitted.) *State* v. *Rios*, 171 Conn. App. 1, 29–30, 156 A.3d 18, cert. denied, 325 Conn. 914, 159 A.3d 232 (2017).

"Preliminary questions concerning . . . the admissibility of evidence shall be determined by the court." Conn. Code Evid. § 1-3 (a). "The requirement of authentication as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the offered evidence is what its proponent claims it to be." Conn. Code Evid. § 9-1 (a). The official commentary to § 9-1 (a) of the Code of Evidence provides in relevant part: "The requirement of authentication applies to all types of evidence, including writings, sound recordings, electronically stored information, real evidence such as a weapon used in the commission of a crime, demonstrative evidence such as a photograph depicting an accident scene, and the like. . . . The category of evidence known as electronically stored information can take various forms. It includes, by way of example only, e-mails, Internet website postings, text messages and 'chat room' content, computer stored records and data, and computer generated or enhanced animations and simulations. As with any other form of evidence, a party

may use any appropriate method, or combination of methods . . . or any other proof to demonstrate that the proffer is what the proponent claims it to be, to authenticate any particular item of electronically stored information." (Citations omitted.)

"It is well established that [a]uthentication is . . . a necessary preliminary to the introduction of most writings in evidence . . . . In general, a writing may be authenticated by a number of methods, including direct testimony or circumstantial evidence. . . .

"Both courts and commentators have noted that the showing of authenticity is not on a par with the more technical evidentiary rules that govern admissibility, such as hearsay exceptions, competency and privilege. . . . Rather, there need only be a prima facie showing of authenticity to the court. . . . Once a prima facie showing of authorship is made to the court, the evidence, as long as it is otherwise admissible, goes to the jury, which will ultimately determine its authenticity." (Internal quotation marks omitted.) *State* v. *Carpenter*, 275 Conn. 785, 856, 882 A.2d 604 (2005), cert. denied, 547 U.S. 1025, 126 S. Ct. 1578, 164 L. Ed. 2d 309 (2006).

"[T]he bar for authentication of evidence is not particularly high. . . . [T]he proponent need not rule out all possibilities inconsistent with authenticity, or . . . prove beyond any doubt that the evidence is what it purports to be . . . . In addition, [a]n electronic document may . . . be authenticated by traditional means such as direct testimony of the purported author or *circumstantial evidence of distinctive characteristics in the document that identify the author*." (Citation omitted; emphasis added; internal quotation marks omitted.) *Gagliardi* v. *Commissioner of Children & Families*, 155 Conn. App. 610, 619, 110 A.3d 512, cert. denied, 316 Conn. 917, 113 A.3d 70 (2015).

Among the examples of methods of authenticating evidence set forth in the official commentary to § 9-1 (a) of the Code of Evidence is that "[a] witness with personal knowledge may testify that the offered evidence is what its proponent claims it to be," and "[t]he distinctive characteristics of an object, writing or other communication, when considered in conjunction with the surrounding circumstances, may provide sufficient circumstantial evidence of authenticity." Conn. Code Evid. § 9-1 (a), commentary. "An unsigned document may be authenticated by any number of circumstances, including its own distinctive characteristics such as its contents and mode of expression, as well as the circumstances and context in which it was found." C. Tait & E. Prescott, Connecticut Evidence § 9.2.3 (5th Ed. 2014).

This court has observed: "The need for authentication arises [in the context of electronic messages from social networking websites] because an electronic communication, such as a Facebook message, an e-mail or a cell

phone text message, could be generated by someone other than the named sender. This is true even with respect to accounts requiring a unique user name and password, given that account holders frequently remain logged in to their accounts while leaving their computers and cell phones unattended. Additionally, passwords and website security are subject to compromise by hackers. Consequently, proving only that a message came from a particular account, without further authenticating evidence, has been held to be inadequate proof of authorship. . . .

"[T]he emergence of social media such as e-mail, text messaging and networking sites like Facebook may not require the creation of new rules of authentication with respect to authorship. An electronic document may continue to be authenticated by traditional means such as the direct testimony of the purported author or circumstantial evidence of distinctive characteristics in the document that identify the author. . . .

"Nevertheless, we recognize that the circumstantial evidence that tends to authenticate a communication is somewhat unique to each medium. . . . [I]n the case of electronic messaging . . . a proponent of a document might search the computer of the purported author for Internet history and stored documents or might seek authenticating information from the commercial host of the e-mail, cell phone messaging or social networking account." (Citations omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Eleck*, 130 Conn. App. 632, 638–41, 23 A.3d 818 (2011), aff'd, 314 Conn. 123, 100 A.3d 817 (2014).[14]

In the present case, the state satisfied its burden of authenticating the exhibit at issue because it presented sufficient evidence to support a finding that the evidence was what the state claimed it to be, namely, a Facebook message sent to Petsa by the defendant. Petsa testified about the circumstances in which she received the message at issue. She and the defendant were Facebook account holders. She received the message, bearing the defendant's name, only after she had agreed to be a part of the defendant's plan to provide false statements to law enforcement and after she had met with an inspector working for defense counsel. This meeting was unfavorable for the defendant because, during the meeting, Petsa did not sufficiently corroborate the defendant's false version of events. Petsa testified that the message at issue was part of a larger series of messages that culminated in the defendant threatening her in various ways after she informed Knowles that she would not participate in the defendant's plan. The fact that the message at issue was part of a larger, related series of messages was part of how the state properly attempted to demonstrate through circumstantial evidence that the message at issue was sent by the defendant. Therefore, it was not improper, as the

defendant argues, for the state to have relied on the other Facebook messages that he sent to Petsa as evidence of the circumstances under which Petsa had received the written message that was memorialized in the exhibit at issue. Petsa testified that the content of these messages made sense to her and revealed things that she would expect the defendant to know. Moreover, Petsa testified that the message at issue, in terms of the unique speaking style that it reflected, as well as its content, led her to believe *definitively* that it had been sent to her by the defendant.

The defendant's arguments before the trial court and before this court seemingly reflect his belief that the state bore the insurmountable burden of ruling out any possibility that the message was not sent by the defendant. The state's burden as the proponent of the evidence, however, was to present "evidence sufficient to support a finding that the offered evidence was what its proponent claims it to be." Conn. Code Evid. § 9-1 (a). Here, in terms of evidence of Petsa's personal knowledge of the defendant and the subject matter of the message, as well as the distinctive characteristics of the communication in light of the surrounding circumstances in which it was made, the state presented sufficient circumstantial evidence of authenticity.[15] It suffices to observe that the court's ruling that the evidence was admissible did not affect the weight that the jury should afford the evidence. The defendant argues that the content of the message did not reflect facts that could only have been known by the defendant and that there was evidence to suggest that it would have been possible for Knowles to have sent the message. These arguments, which were appropriate fodder for the jury in its scrutiny of the state's case, are misdirected at the court's decision to admit the evidence. The defendant had a full opportunity to expose what he believed to be weaknesses in the evidence and to argue to the jury that the evidence lacked probative value.[16]

Finally, we conclude that, even if the court admitted the evidence in error, the ruling was harmless. "When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . [A] nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict. . . . [O]ur determination [of whether] the defendant was harmed by the trial court's . . . [evidentiary ruling] is guided by the various factors that we have articulated as relevant [to] the inquiry of evidentiary harmlessness . . . such as the importance of the . . . testimony in the [state's] case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony . . . on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the [state's] case. . . . Most importantly, we must

examine the impact of the evidence on the trier of fact and the result of the trial." (Internal quotation marks omitted.) *State* v. *Rodriguez*, 311 Conn. 80, 89, 83 A.3d 595 (2014).

The defendant argues that the evidence cannot be considered to be harmless because "it was the only evidence to support the charge of tampering with a witness with respect to Danielle Petsa. Petsa testified that the Facebook message was the only direct communication she had with the defendant about what to say. . . . In the absence of the message, there was insufficient evidence to show that the defendant induced or attempted to induce Petsa to provide false information." (Citations omitted; footnote omitted.)

The record contradicts the defendant's assessment of the evidence. Prior to the admission of the written Facebook message, the state asked Petsa about her communications with the defendant generally. As detailed previously in this opinion, Petsa testified that, initially, Knowles told her about the defendant's plan. Petsa testified that, soon after the defendant's arrest, she met with the defendant and Knowles at Knowles' residence and that the defendant and Knowles discussed the defendant's plan for her to provide false information. Petsa testified that, after she spoke with the investigator, the defendant messaged her on Facebook to reassure her that she could "handle this" and to "keep it calm . . . ." Petsa testified that, after she made it known to Knowles that she would not "back up" the defendant's false story, the defendant sent her a series of messages on Facebook in which he threatened her in various ways. Thus, apart from the written Facebook message that was admitted as an exhibit, there was evidence in the form of Petsa's testimony that described in general terms the defendant's initial attempt on Facebook to encourage Petsa to corroborate his version of events and, later, his unmistakable attempt on Facebook to threaten her to do so. Petsa's oral description of these Facebook messages from the defendant, viewed in light of her entire testimony, supported a finding that the defendant attempted to induce Petsa to testify falsely. At trial, the defendant objected to the admission of the written Facebook message but did not object to Petsa's description of the messages she had received from him on Facebook. In light of Petsa's testimony, the admission of which is not challenged in this appeal, we conclude that the written Facebook message was merely cumulative of other efforts made by the defendant to induce Petsa to testify falsely. Thus, any error with respect to the admission of the evidence was harmless.

The judgments are affirmed.

In this opinion the other judges concurred.

[1] In docket numbers CR-14-0104814-S and MV-14-0372091-S, the state charged the defendant with operating a motor vehicle while under the

influence of intoxicating liquor or any drug in violation of General Statutes § 14-227a (a) (1), operating a motor vehicle while having an elevated blood alcohol content in violation of § 14-227a (a) (2), possession of a small amount of a cannabis-type substance in violation of General Statutes § 21a-279a (a), improperly parking a motor vehicle in violation of General Statutes § 14-251, operating a motor vehicle without carrying an operator's license in violation of General Statutes § 14-213, and making a false statement in the second degree in violation of General Statutes § 53a-157b (a). Additionally, under docket numbers CR-14-0104814-S and MV-14-0372091-S, the state charged the defendant in a part B information as being a third time offender in violation of § 14-227a (g) (3). Under docket number CR-15-016544-S, the state charged the defendant with two counts of tampering with a witness in violation of General Statutes § 53a-151 (a).

The defendant elected a jury trial with respect to the criminal offenses charged by the state, namely, operating a motor vehicle while under the influence of intoxicating liquor or any drug, operating a motor vehicle while having an elevated blood alcohol content, making a false statement, and tampering with a witness. The defendant elected a court trial with respect to the infractions charged by the state, namely, improperly parking a motor vehicle and operating a motor vehicle without carrying an operator's license, and the charge of violation of possession of a small amount of a cannabis-type substance. Over the defendant's objection, the court granted the state's motion to consolidate all of the pending charges for trial.

The jury found the defendant guilty of operating a motor vehicle while under the influence of intoxicating liquor or any drug, operating a motor vehicle while having an elevated blood alcohol content, making a false statement in the second degree, and two counts of tampering with a witness. The court found the defendant guilty of possession of a small amount of a cannabis-type substance, improperly parking a motor vehicle, and operating a motor vehicle without carrying an operator's license. Thereafter, the defendant entered a plea of nolo contendere to the charge of being a third time offender as alleged in the part B information. Following a canvass of the defendant, the court accepted the plea and made a finding of guilt with respect to the part B information. Prior to imposing sentence, the court, pursuant to *State* v. *Polanco*, 308 Conn. 242, 61 A.3d 1084 (2013), vacated the verdict of guilty of operating a motor vehicle while having an elevated blood content. Thereafter, with respect to the remaining charges, the court imposed a total effective sentence of fifteen years of incarceration, execution suspended after seven years, followed by five years of probation.

Although our rules of practice permitted the defendant to bring a joint appeal; Practice Book § 61-7 (a) (1); the defendant, instead, filed three separate appeals: In AC 38103, he appealed from the judgment of conviction rendered in docket number CR-14-0104814-S; in AC 38104, he appealed from the judgment of conviction rendered in docket number MV-14-0372091-S; and in AC 38105, he appealed from the judgment of conviction rendered in docket number CR-15-016544-S. Later, this court, sua sponte, ordered that the three appeals be consolidated.

Despite the fact that, on his appeal forms, he has indicated that he is appealing from all of the crimes and infractions of which he was convicted, he has brought claims on appeal that pertain to only two criminal offenses. His first claim pertains to his conviction for operating a motor vehicle while under the influence of intoxicating liquor or any drug in violation of § 14-227a (a) (1). His second claim pertains to only one of his two convictions for tampering with a witness in violation of § 53a-151 (a). One of the tampering counts was based on his conduct toward Lena Knowles and the other of the tampering counts was based on his conduct toward Danielle Petsa. His second claim pertains to the count based on his conduct toward Petsa. Because he failed to brief any claims with respect to the remaining convictions, he has abandoned any challenge to those convictions. See *Deutsche Bank National Trust Co.* v. *Bertrand*, 140 Conn. App. 646, 648 n.2, 59 A.3d 864, cert. dismissed, 309 Conn. 905, 68 A.3d 661 (2013).

[2] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[3] Grimes advised the defendant, as follows: "You are requested to submit to a blood, breath or urine test chosen by the police officer. You may refuse a blood test, in which case another test will be selected. If you elect to submit to testing, you will be requested to submit two samples. If you refuse to submit, the test will not be given. Your refusal will result in the revocation of your operator's license for [twenty-four] hours and the suspension of your operator's license for at least six months. If you submit to the test and

the results indicate that you have an elevated blood content, your operator's license will be revoked for [twenty-four] hours and will be suspended for at least [ninety] days. If you hold a commercial driver's license, a CDL, your CDL will be disqualified for at least one year. Furthermore, if you are operating a commercial motor vehicle and do not hold a CDL, your privilege to obtain a CDL as well as your privilege to operate a commercial motor vehicle will be disqualified for at least one year. If you hold an operator's license from a state other than Connecticut, your driving privilege in Connecticut is subject to the same revocation and suspension penalties. The results of the test or the fact of a refusal may be admissible in evidence against you in a criminal prosecution for driving under the influence of alcohol and/or drugs or other offense. The evidence of a refusal may be used against you in any criminal prosecution."

[4] There was evidence at trial that these results reflect that, at the time that the defendant's blood was drawn, he had the equivalent of five alcoholic drinks in his body and that a person typically "lose[s] one drink per hour with the range of about a half a drink to a drink-and-a-half per hour."

[5] Ultimately, neither Knowles, Aston, nor Petsa provided false information to law enforcement in accordance with the defendant's plan. After her relationship with the defendant ended, Knowles told an investigator working with defense counsel that the information she previously had provided to him was untrue. She provided a sworn written statement to an inspector working on behalf of the prosecutor in which she detailed the defendant's plan for her to provide a false statement on his behalf. Similarly, Petsa provided an inspector working on behalf of the prosecutor with a sworn statement in which she described the defendant's plan for her to provide a false statement on his behalf. Similarly, prior to trial, Aston told defense counsel that she did not want to lie under oath.

[6] At the close of the state's case-in-chief, the defendant moved for a judgment of acquittal with respect to the operating under the influence charge. In relevant part, the defendant argued that there was no evidence that he had operated the motor vehicle. The court, referring to Grimes' testimony that he had observed the defendant's automobile "go into park and the brake lights go off," determined that there was sufficient evidence of operation. The court denied the motion.

[7] Aston, called by the state as a rebuttal witness, testified that she was not in the company of the defendant at any time during the hours leading up to his arrest.

[8] In addition to his testimony, the defendant presented evidence that the automobile had experienced mechanical problems that led to repairs by a mechanic on March 5, 2014. Also, he presented evidence that, following his arrest, he stated to Knowles and his former wife, Lisa Smith, that the automobile had experienced mechanical problems. Lisa Smith testified that she purchased the defendant's automobile in March, 2014, and that the automobile's motor was repaired on March 5, 2014, because a fan would run when the vehicle was not running. Lisa Smith also testified that the defendant called her in the middle of the night from the police station to tell her that he had experienced a problem with the automobile and that he had been arrested. Smith testified that, after the events at issue, the automobile was repaired for a second time and a new battery was installed in the automobile. It suffices to observe that the issue of whether the defendant's automobile was operable was a disputed issue of fact, the jury was not obligated to accept as true any of the evidence presented by the defense, and that there was ample evidence to support a finding that the defendant had operated the automobile just prior to his encounter with Grimes.

[9] Contrary to the version of events about which the defendant testified at trial, Aston testified that the defendant merely told her that, after he had finished work, he consumed wine at his place of employment "and then, against his better judgment, he ended up deciding to go over to visit [Knowles] and got pulled over that night." The defendant told her that "he was pulled over when the police pulled up behind him."

[10] Relying on his own testimony that the automobile was inoperable, the defendant discounts the probative value of Grimes' observation of the vehicle's lights. We reiterate that the jury, however, could have determined that the defendant's self-serving testimony that the automobile was inoperable was not truthful.

[11] Knowles testified that she contacted her friend, Petsa, because the defendant asked her to do so. Also, Knowles testified that Petsa met with her at Knowles' residence very soon after the defendant's arrest.

[12] We observe that the defendant does not raise any claim of error with respect to Petsa's testimony that he sent her other messages via Facebook in which, in furtherance of his plan, he attempted to compel her to participate in his plan to provide false statements. The state did not attempt to present documentary evidence with respect to these other messages, but their incriminatory content was revealed to the jury by means of Petsa's testimony.

[13] Within his analysis of the authentication issue, the defendant refers to Petsa's testimony, which, as set forth previously, reflects that she copied and pasted the message at issue, and that it was not downloaded and printed directly from her Facebook account. According to the defendant, "[t]his raises valid concerns as to whether the message was a true and accurate copy and whether it actually came from [his] account." At the time of oral argument before this court, however, the defendant clarified that he was not raising a separate claim in this regard. Such an evidentiary claim is not preserved, and we would decline to consider its merits. The trial transcript reveals that the gravamen of the defendant's objection was that the state failed to demonstrate that he authored the message. Although the court asked Petsa to explain in further detail how the message was printed and why, in the court's opinion, it did not appear to have been printed directly from her Facebook account, the defendant's attorney did not raise any objection in this regard. "[T]he standard for the preservation of a claim alleging an improper evidentiary ruling at trial is well settled. This court is not bound to consider claims of law not made at the trial. . . . In order to preserve an evidentiary ruling for review, trial counsel must object properly. . . . In objecting to evidence, counsel must properly articulate the basis of the objection so as to apprise the trial court of the precise nature of the objection and its real purpose, in order to form an adequate basis for a reviewable ruling. . . . Once counsel states the authority and ground of [the] objection, any appeal will be limited to the ground asserted." (Internal quotation marks omitted.) *State* v. *Jorge P.*, 308 Conn. 740, 753, 66 A.3d 869 (2013).

[14] In *Eleck*, this court rejected a defendant's claim that a trial court erroneously excluded from evidence a Facebook message; the trial court's ruling was based on a lack of authentication and, specifically, the defendant's failure to prove authorship of the message. *State* v. *Eleck*, supra, 130 Conn. App. 641–44. In affirming this court's judgment, our Supreme Court assumed, without deciding, that the trial court's ruling was improper and concluded that the evidentiary ruling under review was harmless under the unique facts of the case. *State* v. *Eleck*, 314 Conn. 123, 129–31, 100 A.3d 817 (2014).

[15] The message contains what appears to be the defendant's cell phone number. Although the parties did not refer to this number, or its significance, we observe that during argument on the defendant's objection, the presence of the number on the Facebook message supported a finding that the message was authentic.

[16] The defendant argues that the evidence supported a finding that Knowles could have used his Facebook account to send the message at issue to Petsa. During his cross-examination of Petsa, defense counsel asked her if Knowles had access to the defendant's Facebook account. Petsa testified that she did not know the answer. Moreover, during closing argument, the defendant's attorney argued in relevant part: "The Facebook message, [the defendant] said he didn't send that. People can open Facebook accounts in anybody's name. There are a lot of people with axes to grind here, a lot of people who want to set people up, who don't like people anymore. There's a lot of bad stuff going on here. So, I would ask you to just ignore that, discredit it. If you don't and you decide that it's from [the defendant] to them, I would ask you to look at it critically. Is he telling [them] what to say? No. He's asking them to be clear, to write things down, to get it straight because it's important to him.

"It's easy to misread something. It's easy to assume it's from someone, but those accounts are very easy to open. I could open a Brian Smith account today with Facebook, and nobody questions it and I could start sending all kinds of Brian Smith messages to anybody I care to send them to. There should be more controls on that, but there are not."