******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# STATE OF CONNECTICUT *v.* MICHAEL J. PAPINEAU
## (AC 39474)

Keller, Bright and Norcott, Js.

### *Syllabus*

Convicted of the crimes of assault in the first degree and conspiracy to commit assault in the first degree in connection with the beating of the victim, the defendant appealed to this court. The defendant, his coconspirator, W, and the victim had been preparing to spend the night in an abandoned mill when W repeatedly struck the victim with a baseball bat. The defendant and W thereafter pushed the victim into a hole in the floor, covered him with debris and then left the mill. The next day, while traveling in a car together, W overheard the defendant tell the defendant's former wife, P, in a telephone conversation that the defendant and W had assaulted the victim in the mill. The defendant also asked P in a text message for the phone number of a friend in Ohio because he wanted to find out if the friend would permit him to stay with him. The defendant told P that he intended to leave Connecticut for a five year period because he believed that five years was the length of the statute of limitations for the crime of attempt to commit murder. *Held*:

1. The defendant could not prevail on his claim that the trial court improperly precluded W from testifying about the defendant's telephone conversation with P:

   a. The record was inadequate to review the defendant's claim that W's testimony was offered to impeach P's testimony and as circumstantial evidence of the defendant's state of mind in order to demonstrate that he had not confessed to P that he was involved in the beating of the victim; the defendant's arguments were based on speculation concerning how W may have testified, as the record did not contain the substance of the excluded testimony, the defendant having failed to ask the trial court to hear W's responses to defense counsel's questions outside the presence of the jury.

   b. The defendant's unpreserved claims that W's testimony was admissible under the residual exception to the rule against hearsay and that the trial court's ruling deprived the defendant of his right to present a defense were not reviewable, defense counsel having failed to ask the court to rule on whether his inquiries of W were proper under the residual hearsay exception or to raise any argument concerning the defendant's right to present a defense; moreover, even if the trial court's evidentiary rulings were erroneous, the defendant could not have demonstrated harm, as W had contradicted P's testimony and testified that the defendant, during the telephone conversation, had not discussed traveling to Ohio, that nothing about the telephone conversation bothered or concerned W, and that the conversation concerned normal topics involving the defendant's children.

2. The defendant's unpreserved claim that the trial court improperly precluded defense counsel from eliciting testimony from the defendant's mother, D, that the defendant planned to travel to Massachusetts prior to the events at issue was not reviewable: although the court sustained the prosecutor's objection to certain testimony from D, who answered defense counsel's inquiry before the court ruled on the objection, and the prosecutor did not move to strike D's answer after the court's ruling, nor did the court sua sponte order that the testimony be stricken, D's answer was not part of the evidence, and the defendant did not make a proffer or advance any theory of admissibility following the prosecutor's objection to the question; moreover, even if the claim was reviewable, the defendant could not demonstrate that the court's ruling deprived him of a fair trial, as other testimony from D and W demonstrated that prior to the assault, the defendant and W had told D that they were going away for Christmas, and the defendant was permitted to present evidence that he had preexisting plans to travel to Cape Cod.

3. The trial court did not abuse its discretion by admitting into evidence a

printout of certain text messages between the defendant and P; although the defendant claimed that the messages were not properly authenticated because the phone from which they were sent had not been in the sole custody of the defendant at the time that the messages were sent, the evidence was sufficient to authenticate the messages, as P testified that she and the defendant had been in an ongoing relationship, that the messages were part of an ongoing conversation between them, that the messages prompted telephone conversations between them, which the defendant did not dispute, and that she provided images of the messages to the police, and even if the court's ruling was improper, it was harmless, the defendant having acknowledged that the text messages corroborated P's testimony, which was offered without objection.

4. The evidence was sufficient to support the defendant's conviction of conspiracy to commit assault in the first degree; in light of the evidence presented and the inferences drawn therefrom, the jury reasonably could have found beyond a reasonable doubt that the defendant and W intended to commit the crime of assault in the first degree and agreed with one another to commit the conduct constituting the crime, and that one or both of them engaged in overt acts in furtherance of the conspiracy, as the jury reasonably could have inferred that the defendant and W had a reason to be upset with the victim and planned to retaliate against him in the mill, there was evidence that the defendant actively participated in the crime by joining with W to push the victim into the hole in the floor and cover him with debris, and the defendant did not take any measures to stop the attack or to flee the scene after W violently attacked the victim with the baseball bat, the evidence of the defendant's conduct before, during and after the events at issue reflected that he and W conspired to cause serious physical injury to the victim by means of a dangerous instrument, and the defendant's conduct and statements to P after the events at issue undermined his argument that he was a bystander during those events and, instead, reflected his consciousness of his guilt and bolstered a finding that he had been an active participant with W in a preplanned retaliatory event.

Argued January 29—officially released June 19, 2018

*Procedural History*

Substitute information charging the defendant with the crimes of assault in the first degree, conspiracy to commit assault in the first degree and hindering prosecution in the second degree, brought to the Superior Court in the judicial district of Windham, geographical area number eleven, and tried to the jury before *Swords, J.*; thereafter, the court granted the defendant's motion for a judgment of acquittal as to the charge of hindering prosecution in the second degree; verdict and judgment of guilty of assault in the first degree and conspiracy to commit assault in the first degree, from which the defendant appealed to this court. *Affirmed.*

*James B. Streeto*, senior assistant public defender, with whom was *Edward D. Melillo*, certified legal intern, for the appellant (defendant).

*Laurie N. Feldman*, special deputy assistant state's attorney, with whom, on the brief, were *Anne F. Mahoney*, state's attorney, and *Mark A. Stabile*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

KELLER, J. The defendant, Michael J. Papineau, appeals from the judgment of conviction, rendered following a jury trial, of assault in the first degree with a dangerous instrument in violation of General Statutes § 53a-59 (a) (1), and conspiracy to commit assault in the first degree in violation of General Statutes §§ 53a-59 (a) (1) and 53a-48.[1] The defendant claims (1) that the trial court erroneously precluded his half brother from testifying about a phone conversation that transpired between the defendant and the defendant's former wife; (2) that the court erroneously precluded him from presenting testimony from the defendant's mother that, prior to the events at issue, he planned to travel to Massachusetts; (3) the court erroneously admitted a printout of text messages that the state failed to authenticate; and (4) the evidence was insufficient to support his conviction of conspiracy to commit assault in the first degree. We affirm the judgment of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts. During the afternoon of December 22, 2014, the defendant and his half brother, Joshua Whittington,[2] were walking along railroad tracks in Danielson, at which time they met up with the victim, Jason Tworzydlo. For a period of time prior to the events at issue, the victim had lived with the defendant. As the three men walked together, they discussed where they would sleep that night. The defendant and Whittington indicated to the victim that they needed a place to spend the night, and the victim suggested that they stay in an abandoned textile mill that was located on Maple Street in Danielson where he recently had been staying. The defendant and Whittington agreed to stay there that night.

At approximately 3 p.m., the victim left the company of the defendant and Whittington so that he could attend a counseling session. Meanwhile, the defendant and Whittington explored the mill without him.

At approximately 6 p.m., the three men reunited and, by maneuvering around a fence that surrounded the mill and crawling through a window, they gained access to the inside of the mill. The men carried some of their possessions with them. Whittington was carrying a metal baseball bat. It was very dark inside of the mill; there were no working lights, and only a few light sources illuminated the mill's interior through openings in the walls. The victim used a flashlight. The victim showed the defendant and Whittington a dry location in the mill where he had slept previously. The defendant and Whittington, however, expressed their opinion that the location did not provide ideal sleeping conditions for all of them, so they led the victim to another location inside of the mill, in an area of the mill that used to

house a gym. The defendant and Whittington said that this location, which they had discovered earlier that day, was more suitable to their needs, and the men agreed to spend the night there.

Shortly thereafter, the victim turned away from the defendant and Whittington, at which time Whittington struck him in the head with his baseball bat.[3] He did so with such force that the victim felt the bat "bounce off [his] skull" and "heard the ringing of metal . . . ." Whittington struck the victim several additional times. When the victim asked what was happening, he was told that he had stolen money "from them" on a prior occasion. During some or all of the attack, the defendant used the light on a cell phone to illuminate the victim.

The victim attempted to flee from the defendant and Whittington, but they pushed him into another part of the mill. The victim was stabbed with a sharp object. Ultimately, the defendant and Whittington pushed the victim into a large hole in the floor. As they stood over the victim, he played dead for a brief time. He saw the light of a flashlight from above and overheard the defendant and Whittington as they discussed the amount of blood he had lost, questioned whether he was still alive and breathing, and expressed their belief that he would be dead by the next morning. Whittington stated that he wanted to throw a brick at the victim's head to ensure that he was dead, but he did not do so. The defendant and Whittington covered the victim's body with debris, including tires and tables, before they abandoned the victim in the mill.

When he no longer heard voices or footsteps, the victim, fearing for his survival, crawled out of the hole into which he had been pushed, exited the mill, and made his way to a nearby residence. Barely able to stand, the victim knocked on the front door to summon help. The occupant of the residence, Michael Pepe, found the victim in a dire condition; the victim's body and clothing were soaked in blood. Pepe rendered assistance by wrapping the victim in bedsheets and called 911.

Police and emergency medical personnel responded to the scene. The victim, who was in shock, sustained a variety of significant physical injuries, some of which were life-threatening. The victim's injuries included, but were not limited to, stab wounds, deformities to his face and jaw, a hematoma under his skull, a hematoma on his neck, a collapsed internal jugular vein, multiple bone fractures, and a severe neck laceration. Initially, the defendant was transported to Day Kimball Hospital in Putnam. In light of the severity of the victim's numerous injuries and, in particular, a life-threatening neck wound, Joel Stephen Bogner, an emergency department physician, determined that he should be transported to the trauma center at UMass Memorial Medical Center in Worcester, Massachusetts, for further treatment. With

further treatment, the victim survived the ordeal.

Immediately following the incident, the victim told the police that he was attacked by unknown assailants outside of the mill. The following day, on December 23, 2014, the victim identified the defendant and Whittington as his assailants, and indicated to the police that he was afraid that they would retaliate against him. During their investigation, the police spoke with the defendant, who acknowledged having spent time with the victim on the day of the assault but denied that he or Whittington had played any role in the victim's assault. During the police investigation, Whittington also denied any involvement in the victim's assault. When asked by the police where he kept his clothing, the defendant responded that most of his and Whittington's clothes had been stolen. After meeting with the police on December 23, 2014, the defendant had a telephone conversation with his former wife, Chelsea Papineau. During the conversation, he stated that he and Whittington had assaulted the victim in the mill, but that he and Whittington believed that they had "cleared their names" with the police. This telephone conversation took place while the defendant was traveling with Whittington. On December 25, 2014, the defendant sent Chelsea Papineau a text message in which he asked for the telephone number of a friend of his, Corby Julian, who lived in Ohio. During a telephone conversation with Chelsea Papineau later that day, the defendant indicated that he intended to leave the state for a five year period because, to his understanding, that was how long it would take for the statute of limitations for the crime of attempted murder to expire. He stated that he wanted Julian's telephone number because he wanted to find out if Julian would permit him to stay with him. After Chelsea Papineau complied with the defendant's request, he instructed her to delete her text messages.

Several days later, on January 2, 2015, the police executed arrest warrants on the defendant and Whittington in Falmouth, Massachusetts. At the time of his arrest, the defendant was wearing a pair of jeans that was contaminated with the victim's blood. Additional facts will be set forth as necessary.

I

First, the defendant claims that the court erroneously precluded Whittington's testimony about a phone conversation that had transpired between the defendant and Chelsea Papineau. We disagree.

The following additional facts provide context for the defendant's claim. During the state's case-in-chief, Chelsea Papineau testified that, on December 23, 2014, she had planned for the defendant, who is her former husband and the father of her two children, to visit with his children at his mother's house. At or about 3 p.m., the defendant sent Chelsea Papineau a text mes-

sage in which he stated that he was unable to visit with his children. Chelsea Papineau testified that, at or about 5:30 p.m., she called the defendant to make other visiting arrangements. The following examination by the prosecutor followed:

"Q. And what was his response?

"A. He said that he wouldn't be able to see them; he didn't know when he'd be able to see them again. He and his brother were on their way to his brother's father's house in Glastonbury, Connecticut.

"Q. What else did you talk about?

"A. He asked me if the police had spoken to me yet, and I told him no.

"Q. What did he say to you then?

"A. After I responded with no, he told me he needed to tell me something. He didn't know when he'd be able to see us again.

"Q. Exactly what did he say?

"A. He told me that the previous night him and his brother had met [the victim] . . . and that they went to the mill and just lost it. He told me that they had beat him over the head and that they had left him in the mill.

"Q. What was your response?

"A. I really didn't know how to respond at first. I asked [about the identity of the victim]. And he told me Jason Tworzydlo.

"Q. Did you know [the victim]?

"A. I did.

"Q. How did you know him?

"A. He lived with us for a short time.

"Q. And did he indicate that he was part of this assault?

"A. Yes.

"Q. How did he indicate that?

"A. He just kept saying we.

"Q. At any point did he say Josh and I?

"A. Yes.

"Q. Was there any discussion about the defendant . . . having spoken to the police that day?

"A. Yes. He said that he and, I believe, him and his brother had spoken with the police and that they believed that they had cleared their names.

"Q. Did . . . he express any other concerns . . . ?

"A. He said that they were leaving anyway."

Thereafter, Chelsea Papineau testified that, on the following day, she received text messages from the defendant in which he asked her for the telephone number of a friend, Julian, who lived in Ohio, because he needed to talk with him. She testified that this led to another telephone conversation with the defendant. Chelsea Papineau testified that "[h]e told me that in the past few months [Julian] had offered him a place to stay if he ever needed a place to stay. And he wanted to get a hold of [Julian] to see if that was still available for him." Chelsea Papineau testified that the defendant expressed his belief that he would be charged with attempted murder and that he could evade the charge if he stayed away from Connecticut for five years. Chelsea Papineau testified that after she provided the defendant with Julian's telephone number, he instructed her to delete her text messages. Instead, she provided them to the police.

During the defendant's case-in-chief, Whittington testified in relevant part that on the afternoon of December 23, 2014, he and the defendant were traveling by car to New London. Whittington testified that he overheard a telephone conversation between the defendant and Chelsea Papineau. The present claim is based on two rulings made by the court during Whittington's testimony concerning that telephone conversation.

First, defense counsel asked Whittington, "do you recall what they said—what he said?" The prosecutor objected to the inquiry on the ground that it called for hearsay. Defense counsel stated that the inquiry "goes to impeach [Chelsea] Papineau" and that it "goes to [the defendant's] state of mind, as well." The court sustained the objection.

Second, defense counsel asked Whittington if the defendant said anything to Chelsea Papineau that "implicated him . . . in attacking [the victim]?" The prosecutor objected on the basis of the hearsay ground previously set forth, and the court sustained the objection.

The following examination of Whittington by defense counsel then occurred:

"Q. Okay. How were . . . around that time period . . . [Chelsea] Papineau and [the defendant] getting along?

"A. They were not getting along at all. She was actually trying to get him to sign over his rights to his kids to her.

"Q. And were they communicating very well? . . .

"A. No. They were fighting a lot. They had just gotten divorced and . . . she gets mad a lot. They don't get along even when they were together very much.

"Q. All right. She . . . didn't like [the defendant] at

all, did she?

"A. No.

"Q. Was there ever any discussion on . . . the drive down between you and anybody about you and [the defendant] going to Ohio?

"A. No, there was not.

"Q. And . . . in the phone conversation that [the defendant] had, did any of it bother you or concern you?

"A. No, it did not.

"Q. Did it seem just like a normal conversation about what to do with children?

"A. For the most part, yes."

Additionally, Whittington testified that, on December 23, 2014, he and the defendant were traveling to New London to meet with Whittington's father. He testified that, in accordance with plans made prior to the events at issue, he and the defendant traveled with and spent Christmas with Whittington's father in Cape Cod, Massachusetts.

The defendant claims that the court's rulings in response to the state's objections were erroneous. Relying on the theories of admissibility that he raised before the trial court, he argues that Whittington's testimony in response to defense counsel's inquiry would not have constituted hearsay because it was not offered for its truth, but for the purpose of impeaching Chelsea Papineau's testimony concerning what the defendant had stated to her. Also, the defendant argues that Whittington's testimony would not have constituted hearsay because it was offered not for its truth, but as "circumstantial evidence of [his] innocent state of mind by demonstrating to the jury that he did not confess to his involvement in a crime to Chelsea Papineau."

In addition to raising these preserved evidentiary claims, the defendant argues that "[c]ertain other subclaims, specifically, the right to present a defense . . . and the residual hearsay exception . . . were not referenced [at the time of the court's ruling] but are raised on appeal. These theories are part of the same legal claim."

Arguing that Whittington's testimony would have been admissible under the residual exception to the hearsay rule, the defendant states in relevant part: "In this case, the use of the defendant's statements was reasonably necessary. Whittington was privy to the telephone conversation and testifying against his own interests; his testimony was both critical to the defendant's defense, and the only available source of contradiction of Chelsea Papineau's critical testimony [concerning her phone conversation with the defendant]. Further, it was trustworthy. . . . The defendant's statements were [made] in the context of a phone call the day after the assault. . . . Whittington was testifying against his

own interests . . . . He was available for cross-examination." (Citations omitted.)

With respect to his right to present a defense argument, the defendant states in relevant part: "In this case, the defendant's theory of the case was that he had gone to the abandoned mill with [the victim] and Whittington, but he had not participated in the assault. Chelsea Papineau's testimony that the defendant confessed to participating in the assault was the only clear, certain and unequivocal evidence of his participation. Whittington's testimony refuting that testimony was critical to the defense theory of the case. As such, the defendant's constitutional right to present a defense was implicated by its exclusion." The defendant seeks review of the right to present a defense claim under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[4]

We will address in turn each of the four subclaims that constitute the present claim. We begin by addressing the defendant's claim under the residual exception to the hearsay rule. We decline to review this unpreserved evidentiary claim. "An appellant who challenges on appeal a trial court's exclusion of evidence is limited to the theory of admissibility that was raised before and ruled upon by the trial court. A court cannot be said to have refused improperly to admit evidence during a trial if the specific grounds for admission on which the proponent relies never were presented to the court when the evidence was offered." (Internal quotation marks omitted.) *State* v. *Polynice*, 164 Conn. App. 390, 401, 133 A.3d 952, cert. denied, 321 Conn. 914, 136 A.3d 1274 (2016). We recognize that, during the heat of trial, it is typical for counsel to set forth objections and responses thereto that may not be as complete or well researched as the arguments set forth in an appellate brief, but, at the very least, the arguments raised before the trial court must sufficiently alert the court to their legal significance. As our Supreme Court has observed, "in response to a hearsay objection, although a party need not explicitly identify the hearsay exception that would apply, he or she must at least reference the substance of the applicable exception in order to preserve the claim." *State* v. *Santana*, 313 Conn. 461, 468, 97 A.3d 963 (2014).

Here, defense counsel responded to the state's hearsay objection on the grounds that defense counsel's inquiries would, permissibly, impeach Chelsea Papineau or demonstrate the defendant's state of mind. Defense counsel did not ask the court to rule on whether the inquiries were proper under the residual hearsay exception or make any arguments concerning the trustworthiness or necessity of Whittington's testimony concerning the telephone conversation. Likewise, defense counsel did not raise any arguments concerning the defendant's right to present a defense. Accordingly, the

claim based on the residual clause of the hearsay rule is unpreserved. Defense counsel did not assert such ground before the trial court.

The defendant's other evidentiary claims based on impeachment and state of mind are preserved, yet they are not reviewable on the record before us. The defendant goes to great length in his brief to this court to emphasize the significance of how Whittington possibly may have testified in response to defense counsel's inquiries. He argues that Chelsea Papineau's testimony concerning the defendant's statements to her was highly damaging to the defendant's case. Additionally, he argues: "Whittington's . . . testimony concerning this telephone call was of critical importance. He was present in the car with the defendant while he spoke on the phone with Chelsea Papineau; in fact, it was [Whittington's] cell phone. His testimony would have directly refuted her testimony. It would have impeached Chelsea Papineau. It would have established [that] the telephone call was innocuous, not inculpatory. Without Whittington's testimony, Chelsea Papineau's characterization of the phone conversation was left to stand uncontested, amounting, essentially, to a clear and positive corroboration of the state's version of the assault, in which the defendant played an active part . . . ." The defendant argues that it was critical for the defense that the court permit Whittington to provide detailed information about the conversation he overheard because "Whittington might well have been able to undercut the damning quality of [Chelsea Papineau's] testimony had he been allowed to testify. Had Whittington been allowed to testify . . . it would have explained, refuted, or at a minimum, undercut Chelsea Papineau's testimony."

The defendant's arguments are flawed because they are based on speculation concerning how Whittington *may* have replied to defense counsel's inquiries. The record does not contain the substance of the excluded testimony, and, thus, leaves us without a basis on which to evaluate its relevance. "In Connecticut, our appellate courts do not presume error on the part of the trial court. . . . Rather, the burden rests with the appellant to demonstrate reversible error." (Internal quotation marks omitted.) *Pettiford* v. *State*, 179 Conn. App. 246, 260–61, 178 A.3d 1126 (2017), cert. denied, 328 Conn. 919, 180 A.3d 964 (2018). The defendant bears the burden of providing this court with an adequate record to review his claims. Practice Book § 61-10. The present claim depends on a record that reflects the substance of Whittington's testimony concerning the conversation that he allegedly overheard. This is necessary not merely to determine whether the court properly excluded the testimony, but whether the court's ruling was harmful to the defense.

Although the defendant urges us to conclude that the

excluded testimony was not hearsay and was highly relevant to the defense, the record does not provide an adequate foundation to support such a determination. The defendant easily could have created an adequate record by asking the court to hear Whittington's responses to the questions outside of the presence of the jury. This, however, did not occur. The defendant is unable to demonstrate reversible error on the basis of speculation as to how a witness might have testified at trial because "speculation and conjecture . . . have no place in appellate review." (Internal quotation marks omitted.) *State* v. *Joseph*, 174 Conn. App. 260, 274, 165 A.3d 241, cert. denied, 327 Conn. 912, 170 A.3d 680 (2017).

The same concerns apply to the defendant's right to present a defense claim. Under *Golding*, the defendant bears the burden of demonstrating that the court's exclusion of Whittington's testimony deprived him of a fair trial. Even if we assume, arguendo, that the claim is of constitutional magnitude, it nonetheless fails under *Golding*'s first prong; see footnote 4 of this opinion; because the record is inadequate to review it. Absent a foundation in the record to reflect the substance of the excluded testimony, we are unable to conclude that the court deprived the defendant of a fair trial.

Alternatively, we observe that, even if we were to presume that the court's evidentiary rulings were erroneous and that Whittington would have testified as the defendant claims on appeal, the record before us leads us to conclude that the defendant would be unable to sustain his burden of demonstrating that he was harmed by them.[5] The defendant argues that he should have been permitted to impeach Chelsea Papineau and to demonstrate his innocent state of mind by eliciting testimony from Whittington that he did not hear the defendant make any incriminatory statements concerning the events in the mill and that nothing about the defendant's conversation reflected a guilty state of mind. Yet, as is reflected in our discussion of the court's rulings, Whittington's testimony unmistakably contradicted Chelsea Papineau's testimony with respect to the telephone conversation that she had with the defendant. In contrast with Chelsea Papineau's testimony that the defendant admitted that he and Whittington perpetuated a brutal attack that led him to believe he could be charged with attempted murder and led him to make plans to leave the state immediately, Whittington testified that the defendant did not discuss traveling to Ohio. He testified, as well, that nothing about the telephone conversation bothered or concerned him, and he agreed that the subject of the conversation was "normal" topics involving the defendant's children. Thus, based on what we may glean from the defendant's arguments on appeal and the record he has provided this court for review, it appears that the rulings were harmless because the excluded testimony would have been substantially

cumulative of Whittington's trial testimony.

Moreover, in connection with his claim that the court's rulings infringed on his right to present a defense, one of our important considerations as a reviewing court is not only the nature of the excluded inquiry, but also whether it was adequately covered by other questions that were allowed.[6] For the reasons we have discussed, it appears from the defendant's arguments and the record that defense counsel unambiguously elicited from Whittington that, during the telephone call with Chelsea Papineau, the defendant did not make any statements of an incriminating nature. Moreover, Whittington testified that the defendant was traveling to Massachusetts with him in accordance with holiday travel plans that existed prior to the events at issue. Unaided by a proffer that would have provided this court with a record reflecting what further details Whittington would have provided if he had been permitted to do so, the defendant merely argues on appeal that "[t]he details of this exchange [between the defendant and Chelsea Papineau] were critical . . . ." The defendant does not demonstrate how further testimony from Whittington would have helped the defense. In the absence of such further details and because the defendant was permitted to elicit testimony from Whittington that reflected the innocent tone and subject of the telephone conversation, thereby impeaching Chelsea Papineau, it is highly unlikely that the excluded inquiry infringed on his right to present a defense.

II

Next, the defendant claims that the court erroneously precluded him from presenting testimony from his mother that, prior to the events at issue, he planned to travel to Massachusetts. We disagree.

The following additional facts are relevant to this claim. The defense presented testimony from Denise Papineau, the mother of the defendant and Whittington. She testified that she was close with both of her sons. During Denise Papineau's direct examination by defense counsel, the following occurred:

"[Defense Counsel]: . . . I want to turn your attention to . . . December 22, 2014, that afternoon, did you see the two of them that afternoon?

"[The Witness]: Yes. They came over in the afternoon before I went to work. They wanted to let me know that they were going away for Christmas and . . . I wasn't gonna see them for Christmas.

"[Defense Counsel]: And was . . . there . . . any other reason for letting you know about that?

"[The Witness]: So I could make arrangements to see my grandchildren.

"[Defense Counsel]: And . . . who's the mother of the grandchildren?

"[The Witness]: Chelsea [Papineau] was [the defendant's] wife and Lexi, which was [Whittington's] girlfriend.

"[Defense Counsel]: And . . . did [Whittington] and . . . [the defendant] talk about . . . what they . . . were gonna do?

"[The Witness]: They were supposed to go with—

"[The Prosecutor]: Objection.

"[The Witness]: —[Whittington's] dad to—

"The Court: Wait.

"[The Witness]: —Cape Cod.

"The Court: Wait, wait, wait. There's an objection, so you just hold on—

"[The Witness]: I'm sorry.

"The Court: —for a minute.

"[The Prosecutor]: Hearsay.

"The Court: Okay. What was the question, [defense counsel]?

"[Defense Counsel]: I asked what . . . their plans were for Christmas.

"The Court: Okay. I'm gonna sustain the objection."

Without making any further argument regarding admissibility, the state's objection, or the court's ruling, defense counsel proceeded in his examination of Denise Papineau. On appeal, the defendant argues that the court improperly precluded Denise Papineau from testifying that the defendant and Whittington had preexisting plans to vacation in Cape Cod. The defendant argues that the testimony fell within the state of mind and residual exceptions to the hearsay rule. See Conn. Code Evid. §§ 8-3 (4) and 8-9. Also, the defendant argues that the court's ruling represented "a critical blow to the defense," as it desperately needed to refute the state's consciousness of guilt evidence, which included Chelsea Papineau's testimony that the defendant intended on fleeing the state and evidence that the defendant was arrested in Massachusetts.

The defendant argues that he preserved this evidentiary claim by means of "the actual proffer" he made at the time of trial.[7] Alternatively, the defendant argues that the claim is of constitutional magnitude because it implicates "the defendant's right to present a defense and to refute the evidence against him." On this basis, he argues that the claim, if not preserved, is reviewable under the doctrine set forth in *State* v. *Golding*, supra, 213 Conn. 239–40,[8] and that the court's rulings deprived him of a fair trial. Also, the defendant argues that we should grant him relief under the plain error doctrine. See Practice Book § 60-5.

Before considering issues of reviewability related to this claim, we address the state's contention that the claim is undermined by the fact that Denise Papineau's testimony concerning the defendant's plan to travel to Massachusetts was, in fact, part of the evidence before the jury. The state correctly observes that although the court sustained the prosecutor's objection, Denise Papineau answered defense counsel's inquiry before the court ruled on the objection, the prosecutor did not move to strike the testimony after the court ruled in its favor, and the court did not sua sponte order that the testimony be stricken. The state argues that, in light of the court's preliminary[9] and final instructions[10] to the jury, the jury would have been left with the impression that her answer was part of the evidence. The defendant argues that, guided by the court's preliminary instructions, the jury would have been left with the impression that the answer was not part of the evidence.

Relying on this court's analysis in *State* v. *Holley*, 160 Conn. App. 578, 626–30, 127 A.3d 221 (2015), rev'd, 327 Conn. 576, 175 A.3d 514 (2018), and binding authority cited therein, which includes *State* v. *Lewis*, 303 Conn. 760, 779–80, 36 A.3d 670 (2012), and *Hackenson* v. *Waterbury*, 124 Conn. 679, 684, 2 A.2d 215 (1938), we conclude that Denise Papineau's testimony concerning the defendant's plan to travel to Cape Cod was not part of the evidence before the jury. As the state argues, the court's preliminary instructions reflect that any testimony that is not stricken by the court is part of the evidence. Yet, the court's instructions do not specifically address the situation that occurred here. The record reflects that the prosecutor timely objected to defense counsel's inquiry. The witness, however, continued to testify despite the fact that the objection was pending, and the court clearly had instructed her to "wait" before continuing to answer. The witness failed to comply with the court's instruction, leading the court, once again, to instruct the witness to "[w]ait, wait, wait." The court stated that an objection was pending. Then, in the jury's presence, the court ruled in favor of the state. In light of these unique circumstances, we conclude that the jury would have believed that Denise Papineau's rushed response to defense counsel's inquiry was improper and, thus, that it was not part of the evidence.[11]

Next, we consider whether the evidentiary claim raised on appeal was adequately preserved. We readily conclude that it was not. The defendant neither made a proffer nor advanced any theory of admissibility to the trial court following the prosecutor's objection on hearsay grounds. Certainly, defense counsel's silence did not alert the court to the present claim. "It is well settled that this court will not entertain claims of evidentiary error that were not distinctly raised before the trial court." *Wilderman* v. *Powers*, 110 Conn. App. 819,

828, 956 A.2d 613 (2008); see also *State* v. *Polynice*, supra, 164 Conn. App. 401 (appellant limited to theory of admissibility raised before and ruled on by trial court). Here, the defendant did not advance any theory of admissibility before the trial court.

We turn now to the defendant's right to present a defense claim, for which he seeks review under *Golding*. See footnote 4 of this opinion. The defendant's recourse to *Golding* fails for several reasons. First, the claim is not reviewable under *Golding*'s second prong, which requires that the claim be of constitutional magnitude and that it allege the violation of a fundamental right. Phrasing the claim in terms of his right to present a defense represents the defendant's attempt to clothe an unpreserved evidentiary claim in constitutional garb. "Regardless of how the defendant has framed the issue, he cannot clothe an ordinary evidentiary issue in constitutional garb to obtain appellate review." (Internal quotation marks omitted.) *State* v. *Warren*, 83 Conn. App. 446, 452, 850 A.2d 1086, cert. denied, 271 Conn. 907, 859 A.2d 567 (2004). At trial, the defendant did not advance any theories under which statements to Denise Papineau about his travel plans should have been admitted. Here, he argues that the court's ruling precluding such testimony infringed on his right to refute the state's consciousness of guilt evidence. "It has . . . been stated numerous times that consciousness of guilt issues are not constitutional and, therefore, are not subject to review under [*Golding*]." (Internal quotation marks omitted.) *State* v. *Guzman*, 110 Conn. App. 263, 270, 955 A.2d 72 (2008), cert. denied, 290 Conn. 915, 965 A.2d 555 (2009); see also *State* v. *Lugo*, 266 Conn. 674, 691–92 and 692 n.17, 835 A.2d 451 (2003) (claim that trial court improperly declined to allow defendant to present evidence to refute state's consciousness of guilt evidence deemed to be "purely evidentiary" and not subject to constitutional analysis).

Even if the claim was reviewable under *Golding*, the claim would fail under *Golding*'s third prong because the defendant is unable to demonstrate that he was deprived of a fair trial. As we discussed in part I of this opinion, an important consideration in an evaluation of whether a trial court's decision not to admit evidence infringed on a defendant's right to present a defense is whether the defense was permitted to cover the field of inquiry by other means. See footnote 6 of this opinion. "A defendant may not successfully prevail on a claim of a violation of his right to present a defense if . . . he adequately has been permitted to present the defense by different means." *State* v. *Santana*, supra, 313 Conn. 470; see also *State* v. *Kelly*, 256 Conn. 23, 76, 770 A.2d 908 (2001) (no violation of constitutional right to present defense where subject matter of precluded testimony was presented through other witnesses).

According to the defendant's theory, Denise Papi-

neau's testimony concerning the defendant's plans to travel to Cape Cod for Christmas was relevant to rebut the inference that he fled to Massachusetts, where he later was arrested, because he was conscious that he was criminally liable for his role in the victim's assault.[12] The defendant was permitted to present evidence that rebutted this inference. Specifically, defense counsel was permitted to elicit testimony from Denise Papineau that during the afternoon of December 22, 2014, prior to the assault, the defendant and Whittington visited with her and told her that they were "going away for Christmas" and that she would not see them on Christmas. Additionally, Whittington testified that between 3 p.m. and 6 p.m. on December 22, 2014, he and the defendant visited with Denise Papineau. He testified: "We discussed going to my dad's and then to Cape Cod to my cousin's for Christmas vacation." Whittington testified that this was something that he did "almost every year" and that there was "a discussion about what's gonna happen with the grandkids."

Whittington's father, David Whittington, testified that spending Christmas in Cape Cod with the defendant and Joshua Whittington generally was an annual tradition. David Whittington testified that the "plan" was for the defendant and Joshua Whittington to be at his house in New London on December 23, 2014, and they were there by the time that he finished work on that day. David Whittington testified that, that evening, his wife transported him, the defendant, and Joshua Whittington to her residence in Glastonbury. Thereafter, the defendant and Whittington traveled with David Whittington and his wife to visit with relatives on Cape Cod. David Whittington testified that while the defendant and Joshua Whittington were at his home on December 23, 2014, he invited them to live there with the hope that they could gain employment and "get a life." He testified that, in his view, they enthusiastically accepted that invitation.

The foregoing discussion reflects that the defendant was permitted to present evidence that he had preexisting plans to travel to Cape Cod by means other than the narrow inquiry that was excluded by the trial court. Thus, the defendant is unable to demonstrate that the court violated his right to a fair trial and, thus, his claim fails under *Golding*'s third prong.[13]

### III

Next, the defendant claims that the court erroneously admitted a printout of text messages that the state failed to authenticate. We disagree.

The following additional facts are relevant to this claim. As we have discussed previously in this opinion, Chelsea Papineau testified that, at or about 3 p.m. on December 23, 2014, the defendant sent her a text message in which he indicated that he would not be able

to visit with his children at his mother's house that day. At or about 5:10 p.m. that day, Chelsea Papineau called the defendant, and during their conversation, the defendant told her that he did not know when he would be able to see her or the children again, that he and his brother had assaulted the victim in the mill, and that he and his brother had spoken with the police about the incident. Chelsea Papineau testified that although the defendant believed that they had "cleared their names" with the police, "they were leaving anyway."

Chelsea Papineau testified that the next day, December 24, 2014, the defendant sent her another text message in which he asked her for the phone number of their friend, Julian, who lived in Ohio. Chelsea Papineau said that, following this request, she spoke to the defendant on the telephone. The defendant told her that Julian recently had offered him a place to stay if he ever needed a place to stay and that he wanted to see if that invitation was still open to him. Chelsea Papineau testified that the defendant expressed his belief that there was a five year statute of limitation for the crime of attempted murder and, therefore, he believed that he needed to leave Connecticut for at least five years. Chelsea Papineau testified that the defendant asked her to delete her text messages. Instead, setting aside her initial belief that "it was a joke," she brought the text messages to the attention of the state police.

At the prosecutor's request, the court marked a four page document as an exhibit for identification. It suffices to observe that the content of the messages is consistent with Chelsea Papineau's testimony about them.[14] The following examination of Chelsea Papineau by the prosecutor followed:

"Q. . . . I'm showing you a four page document . . . . I'd ask you to look through those pages at this time; just look through them, and then tell us whether or not you recognize them.

"A. Yes, I do.

"Q. What do you recognize them to be?

"A. This is the phone conversation, the text conversation from the 23rd and the 24th between [the defendant] and myself.

"Q. And how were those created? Do you recall?

"A. I took a screenshot of my cell phone—

"Q. And the police . . . took them.

"A. —and then I e-mailed them.

"Q. So, those are the text messages between you and the defendant from the 23rd and the 24th of December of 2014?

"A. Yes."

When the prosecutor offered the document to be

admitted as a full exhibit, defense counsel objected on three grounds, namely, that the document constituted hearsay, the document bolstered the testimony of Chelsea Papineau because she already had testified about its content and her conversations with the defendant, and the document was not authenticated. With regard to the latter ground, defense counsel stated that there was no way to verify that the messages actually came from the defendant's telephone. The prosecutor replied: "She's established the authenticity. These are part of a series of conversations of the two days, both telephonic and text. Documents and electronic evidence can corroborate a witness' testimony and she has authenticated [them]."

The court overruled defense counsel's objection, stating: "This witness has adequately authenticated those text messages as coming from the defendant. And, of course, they're admissible as statements of the defendant."

During Chelsea Papineau's cross-examination by defense counsel, the following examination occurred:

"Q. . . . Back on December . . . 22nd, 23rd, 24th, did [the defendant] have a telephone?

"A. No.

"Q. So, he was calling you on somebody else's telephone?

"A. His brother's.

"Q. And those texts came from his brother's phone?

"A. Yes.

"Q. So, you . . . have no idea if he entered those texts or not, do you?

"A. I'm very positive it was him, but no.

"Q. You . . . weren't there when . . . it was being done. Is that correct?

"A. No, I didn't see him physically do it. No.

"Q. All right. And it's his brother's telephone?

"A. Yes."

During redirect examination of Chelsea Papineau by the prosecutor, she testified that from the time that she divorced the defendant in August, 2014, until the time of these text messages in December, 2014, she took steps to keep the defendant involved in the lives of their children. She testified that the text messages that she described were interrelated with telephone conversations that she had with the defendant, and agreed that the text messages and telephone conversations were part of a single string of conversations between her and the defendant.

Echoing the arguments that he raised before the trial

court, the defendant argues before this court that "[the] text messages, purportedly between the defendant and Chelsea Papineau . . . were not properly authenticated because the phone they were sent from was not in the sole custody of the defendant at the time they were made, and the messages in question cannot be said with sufficient certainty to have been made by the defendant."

"To the extent a trial court's admission of evidence is based on an interpretation of the Code of Evidence, our standard of review is plenary. For example, whether a challenged statement properly may be classified as hearsay and whether a hearsay exception properly is identified are legal questions demanding plenary review. They require determinations about which reasonable minds may not differ; there is no judgment call by the trial court, and the trial court has no discretion to admit hearsay in the absence of a provision providing for its admissibility. . . .

"We review the trial court's decision to admit evidence, if premised on a correct view of the law, however, for an abuse of discretion. . . . In other words, only after a trial court has made the legal determination that a particular statement is or is not hearsay, or is subject to a hearsay exception, is it vested with the discretion to admit or to bar the evidence based upon relevancy, prejudice, or other legally appropriate grounds related to the rule of evidence under which admission is being sought. For example, whether a statement is truly spontaneous as to fall within the spontaneous utterance exception will be reviewed with the utmost deference to the trial court's determination. Similarly, appellate courts will defer to the trial court's determinations on issues dictated by the exercise of discretion, fact finding, or credibility assessments." (Citations omitted; internal quotation marks omitted.) *State* v. *Saucier*, 283 Conn. 207, 218–19, 926 A.2d 633 (2007).

"It is axiomatic that [t]he trial court's ruling on the admissibility of evidence is entitled to great deference. . . . In this regard, the trial court is vested with wide discretion in determining the admissibility of evidence . . . . Accordingly, [t]he trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . Furthermore, [i]n determining whether there has been an abuse of discretion, every reasonable presumption should be made in favor of the correctness of the trial court's ruling, and we will upset that ruling only for a manifest abuse of discretion. . . . Even when a trial court's evidentiary ruling is deemed to be improper, we must determine whether that ruling was so harmful as to require a new trial. . . . In other words, an evidentiary ruling will result in a new trial only if the ruling was both wrong and harmful. . . .

"Preliminary questions concerning . . . the admissibility of evidence shall be determined by the court. Conn. Code Evid. § 1-3 (a). The requirement of authentication as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the offered evidence is what its proponent claims it to be. Conn. Code Evid. § 9-1 (a). The official commentary to § 9-1 (a) of the Code of Evidence provides in relevant part: The requirement of authentication applies to all types of evidence, including writings, sound recordings, electronically stored information, real evidence such as a weapon used in the commission of a crime, demonstrative evidence such as a photograph depicting an accident scene, and the like. . . . The category of evidence known as electronically stored information can take various forms. It includes, by way of example only, e-mails, Internet website postings, text messages and chat room content, computer stored records and data, and computer generated or enhanced animations and simulations. As with any other form of evidence, a party may use any appropriate method, or combination of methods . . . or any other proof to demonstrate that the proffer is what the proponent claims it to be, to authenticate any particular item of electronically stored information. . . .

"It is well established that [a]uthentication is . . . a necessary preliminary to the introduction of most writings in evidence . . . . In general, a writing may be authenticated by a number of methods, including direct testimony or circumstantial evidence. . . .

"Both courts and commentators have noted that the showing of authenticity is not on a par with the more technical evidentiary rules that govern admissibility, such as hearsay exceptions, competency and privilege. . . . Rather, there need only be a prima facie showing of authenticity to the court. . . . Once a prima facie showing of authorship is made to the court, the evidence, as long as it is otherwise admissible, goes to the jury, which will ultimately determine its authenticity. . . .

"[T]he bar for authentication of evidence is not particularly high. . . . [T]he proponent need not rule out all possibilities inconsistent with authenticity, or . . . prove beyond any doubt that the evidence is what it purports to be . . . . In addition, [a]n electronic document may . . . be authenticated by traditional means such as direct testimony of the purported author or circumstantial evidence of distinctive characteristics in the document that identify the author. . . .

"Among the examples of methods of authenticating evidence set forth in the official commentary to § 9-1 (a) of the Code of Evidence is that [a] witness with personal knowledge may testify that the offered evidence is what its proponent claims it to be, and [t]he

distinctive characteristics of an object, writing or other communication, when considered in conjunction with the surrounding circumstances, may provide sufficient circumstantial evidence of authenticity. Conn. Code Evid. § 9-1 (a), commentary. An unsigned document may be authenticated by any number of circumstances, including its own distinctive characteristics such as its contents and mode of expression, as well as the circumstances and context in which it was found. C. Tait & E. Prescott, Connecticut Evidence (5th Ed. 2014) § 9.2.3.

"This court has observed: The need for authentication arises [in the context of electronic messages from social networking websites] because an electronic communication, such as a Facebook message, an e-mail or a cell phone text message, could be generated by someone other than the named sender. This is true even with respect to accounts requiring a unique user name and password, given that account holders frequently remain logged in to their accounts while leaving their computers and cell phones unattended. Additionally, passwords and website security are subject to compromise by hackers. Consequently, proving only that a message came from a particular account, without further authenticating evidence, has been held to be inadequate proof of authorship. . . .

"[T]he emergence of social media such as e-mail, text messaging and networking sites like Facebook may not require the creation of new rules of authentication with respect to authorship. An electronic document may continue to be authenticated by traditional means such as the direct testimony of the purported author or circumstantial evidence of distinctive characteristics in the document that identify the author. . . .

"Nevertheless, we recognize that the circumstantial evidence that tends to authenticate a communication is somewhat unique to each medium. . . . [I]n the case of electronic messaging . . . a proponent of a document might search the computer of the purported author for Internet history and stored documents or might seek authenticating information from the commercial host of the e-mail, cell phone messaging or social networking account." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Smith*, 179 Conn. App. 734, 761–64, 181 A.3d 118, cert. denied, 328 Conn. 927,      A.3d      (2018).

Here, the state presented sufficient evidence to demonstrate that the document at issue was what the state claimed it to be, namely, a series of text messages between the defendant and Chelsea Papineau on December 23 and 24, 2014. The defendant urges us to conclude that the record did not provide "certainty" that the defendant sent the text messages at issue, yet as our discussion of the applicable legal standard reflects, the state did not bear the burden of ruling out any possibility that the messages did not originate with

the defendant, but was permitted to establish his authorship by means of circumstantial evidence. Chelsea Papineau's testimony provided strong circumstantial evidence of authorship. Chelsea Papineau was in an ongoing relationship with the defendant, her former husband, and she testified that these text messages were part of an ongoing conversation between them.[15] Moreover, the text messages at issue prompted telephone conversations between Chelsea Papineau and the defendant. Although the defense disagrees with the state about the content of those telephone conversations, the defense does not appear to dispute that they, in fact, occurred. Chelsea Papineau testified that she captured images of these text messages and provided them to the state police. In these circumstances, no additional means of authentication were necessary.

The defendant relies, in part, on Chelsea Papineau's testimony during cross-examination that the text messages originated from Whittington's telephone to challenge the court's decision to admit the exhibit. We observe that this testimony, which came after the court's ruling, is not a sufficient basis on which to challenge the ruling. See, e.g., *State* v. *Harris*, 32 Conn. App. 476, 481 n.4, 629 A.2d 1166 ("[w]e are bound to evaluate the propriety of the trial court's rulings on the basis of the facts known to the court at the time of its rulings"), cert. denied, 227 Conn. 928, 632 A.2d 706 (1993). Even if we were to consider this later testimony, however, it does not affect our analysis. Chelsea Papineau testified that these messages were part of a series of conversations between her and the defendant, these conversations included telephone calls with the defendant (a person with whom she was very familiar), and that she was "very positive" that the text messages were from the defendant. In light of this evidence, it is of no consequence to our analysis that the defendant utilized Whittington's telephone to send the text messages. The circumstantial evidence provided an adequate foundation upon which to find that the defendant, not Whittington, authored the text messages.[16] The defendant has not demonstrated that the court's ruling reflects an abuse of its discretion.

Assuming, arguendo, that the court's evidentiary ruling, which was not of constitutional magnitude, was improper, we readily would conclude that it was harmless. Previously in this opinion, we set forth the standard for harmless error. See footnote 5 of this opinion. As the defendant acknowledges, the text messages substantially corroborated other evidence that was offered absent objection, namely, Chelsea Papineau's testimony. In light of this other evidence of the defendant's text messages to Chelsea Papineau, the defendant is unable to demonstrate that the court's ruling substantially affected the verdict.

IV

Finally, the defendant claims that the evidence was insufficient to support his conviction of conspiracy to commit assault in the first degree in violation of §§ 53a-59 (a) (1) and 53a-48.[17] We disagree.

The defendant argues that "[t]he evidence, even in the light most favorable to sustaining the verdict, contains no evidence of an agreement between the defendant and [Whittington] to cause serious physical injury to [the victim] by means of a deadly weapon. Rather, the evidence, even if it is construed as favorably as possible to the state, suggests a spontaneous outburst of violence, not a planned assault. . . .

"[E]ven [when viewed] in the light most favorable to sustaining the verdict, the evidence shows that the defendant, [the victim] and Whittington went to the abandoned mill at [the victim's] suggestion, that there was no expressed preassault animosity between them, and that nothing indicated any possibility that the assault would break out until Whittington suddenly, spontaneously, and without warning hit [the victim] with a baseball bat." Additionally, the defendant argues that although the victim testified that he and Whittington appeared to be working together, he failed to describe "coordination or communication between the two aside from walking through the mill and trying to find a place to sleep before the attack." Moreover, the defendant relies on Whittington's testimony that the defendant had no role in the attack, there had been no conversations about harming the victim, and that Whittington threatened to strike him when he attempted to intervene on the victim's behalf.

"In reviewing a sufficiency of the evidence claim, we apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . . Moreover, [w]here a group of facts are relied upon for proof of an element of the crime it is their cumulative impact that is to be weighed in deciding whether the standard

of proof beyond a reasonable doubt has been met and each individual fact need not be proved in accordance with that standard. It is only where a single fact is essential to proof of an element, however, such as identification by means of fingerprint evidence, that such evidence must support the inference of that fact beyond a reasonable doubt. . . .

"As we have often noted, however, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the trier, would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty. . . . Furthermore, [i]t is immaterial to the probative force of the evidence that it consists, in whole or in part, of circumstantial rather than direct evidence." (Internal quotation marks omitted.) *State* v. *Edwards*, 325 Conn. 97, 136–37, 156 A.3d 506 (2017).

Section 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . ." "To obtain a conviction for conspiracy to commit assault in the first degree in violation of §§ 53a-48 (a) and 53a-59 (a) (1), as charged, the state bore the burden of proving beyond a reasonable doubt that the defendant (1) intended that conduct constituting the crime of assault in the first degree be performed, (2) agreed with one or more persons to engage in or cause the performance of such conduct and (3) that any one of those persons committed an overt act in pursuance of such conspiracy. Conspiracy is a specific intent crime, with the intent divided into two parts: (1) the intent to agree to conspire; and (2) the intent to commit the offense that is the object of the conspiracy. . . . To sustain a conviction for conspiracy to commit a particular offense, the prosecution must show not only that the conspirators intended to agree but also they intended to commit the elements of the offense." (Internal quotation marks omitted.) *State* v. *Wells*, 100 Conn. App. 337, 347–48, 917 A.2d 1008, cert. denied, 282 Conn. 919, 925 A.2d 1102 (2007).

"[T]he existence of a formal agreement between the conspirators need not be proved [however] because [i]t is only in rare instances that conspiracy may be established by proof of an express agreement to unite to accomplish an unlawful purpose. . . . [T]he requisite agreement or confederation may be inferred from proof of the separate acts of the individuals accused as cocon-

spirators and from the circumstances surrounding the commission of these acts. . . . Further, [c]onspiracy can seldom be proved by direct evidence. It may be inferred from the activities of the accused persons. . . . Finally, [b]ecause direct evidence of the accused's state of mind is rarely available . . . intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom." (Citation omitted; internal quotation marks omitted.) *State* v. *Danforth*, 315 Conn. 518, 532–33, 108 A.3d 1060 (2015); see also *State* v. *Smith*, 36 Conn. App. 483, 486, 651 A.2d 744 (1994) (sufficient for state to demonstrate that actors mutually agreed to commit forbidden act), cert. denied, 233 Conn. 910, 659 A.2d 184 (1995).

We begin our analysis of the evidence by focusing on the defendant's undisputed relationship with Whittington, who testified that he was the sole perpetrator of the violent assault. The evidence reflects that it was not a coincidence for the defendant and Whittington to be together in the mill on the night of December 22, 2014. They were half brothers who, according to defense witnesses, shared a close relationship. This type of relationship, while not dispositive, makes it less likely that they acted independently in the mill and more likely that they acted in unison. See *State* v. *Henderson*, 83 Conn. App. 739, 748–49, 853 A.2d 115 (evidence of nature of relationship between alleged coconspirators relevant to issue of existence and object of conspiracy), cert. denied, 271 Conn. 913, 859 A.2d 572 (2004).

The evidence supported a finding that, prior to the attack in the mill, the defendant and Whittington were upset with the victim because they believed that he had stolen money from one or both of them on a prior occasion. The defendant and Whittington knew that, later that night, the victim would return to the darkened, abandoned mill because they had made plans to meet him there. After making arrangements to spend the night in the mill with the victim, the defendant and Whittington had an opportunity to explore the mill in the victim's absence and found a favorable location in the mill in which to retaliate against him. Whittington arrived at the mill while carrying a dangerous instrument, namely, a metal baseball bat.[18]

The evidence demonstrated that, once the three men were alone in the mill, it was Whittington who began the altercation by striking the victim in the back of the head when he had turned away from him. There was evidence that the defendant did not attempt to stop the altercation and did not flee the scene. Whittington struck the victim repeatedly with the bat, and there was evidence that the victim had been stabbed repeatedly. The evidence is undisputed that the three men were alone inside of the mill, and Whittington denied that

he stabbed the victim.[19] The victim testified that the defendant and Whittington seemed to be working together as he was pushed into the hole in the floor. This was corroborated by Whittington's testimony that he and the defendant had dragged the victim in the mill. Then, the defendant and Whittington threw debris on top of him. Once he was in the hole, the victim overheard the defendant and Whittington discuss his dire condition before abandoning him in the mill.

After they left the victim, the defendant and Whittington provided false information to the police about the events at issue to conceal their participation in the crime. The defendant told the police that his clothing had been stolen. The defendant and Whittington did not go their separate ways following the assault, but remained together.[20] Ultimately, they left the state together. In his conversation with Chelsea Papineau, the defendant did not express remorse or indicate that he was a bystander to the events at issue, but acknowledged to his former wife that he and Whittington had beaten the victim violently in the mill and had left him there. The defendant, believing that he faced an attempted murder charge, indicated his intention to flee to Ohio for at least five years in an attempt to evade criminal liability for the events that transpired in the mill.

The foregoing subordinate facts, which the jury reasonably could have found, and the rational inferences drawn therefrom, support a finding beyond a reasonable doubt that the defendant and Whittington intended to commit the crime of assault in the first degree, agreed with one another to commit the conduct constituting the crime, and that one or both of them engaged in overt acts in furtherance of the conspiracy.

The jury reasonably could have inferred that the defendant and Whittington had a reason to be upset with the victim prior to the attack.[21] The jury reasonably could have inferred that, following their initial meeting with the victim, they planned to retaliate against him in the mill.[22] Whittington, not the victim, initiated the assault by utilizing the baseball bat that he brought with him to the mill. The evidence suggested that Whittington waited for an opportune moment in which to strike the victim with the bat, and that he and the defendant had planned to lure the victim to their choice of location inside of the mill, where they could push the victim into the hole in the floor. The joint efforts of the defendant and Whittington in this location reflected that it was not a spur of the moment occurrence, as the defendant argues. There was evidence to support a finding that the defendant actively participated in the crime by joining with Whittington to push him into the hole in the floor and cover him with debris. See, e.g., *State* v. *Forde*, 52 Conn. App. 159, 168, 726 A.2d 132 (commission of single act in furtherance of conspiracy sufficient

to demonstrate knowing participation), cert. denied, 248 Conn. 918, 734 A.2d 567 (1999).

It is significant to our analysis of intent and whether an agreement existed that, according to the victim's testimony, the defendant did not take any measures to stop the attack or to flee the scene after Whittington violently used a baseball bat to strike the victim repeatedly. The defendant did not express surprise or outrage, nor at any point in time did he insist that help be summoned. Instead, the jury reasonably could have found that the defendant was an active participant in the attack by utilizing the light on Whittington's cell phone to illuminate the victim while Whittington struck him with the baseball bat, stabbing the victim repeatedly, working with Whittington to drag the victim into the hole in the floor, and covering the victim's badly injured body with debris. Thereafter, the defendant and Whittington discussed the effects of their attack as the victim was lying in the hole. The evidence supported a finding that the defendant remained on the scene during the multiple phases of the attack, helping to injure the victim severely, until the victim was incapacitated. Thereafter, the defendant left the mill just as he had arrived at the mill, in unison with Whittington. The defendant's coordinated conduct with Whittington strongly reflected his participation in a plan to retaliate against the victim by inflicting serious injury. See *State* v. *Millan*, 290 Conn. 816, 828, 966 A.2d 699 (2009) ("[a] coconspirator's conduct at the scene can provide the requisite evidence of an agreement"); *State* v. *Elsey*, 81 Conn. App. 738, 747, 841 A.2d 714 ("the jury could have based at least part of its decision regarding the conspiracy charges on the defendant's decision to come to the scene of the crime with the coconspirators, stay at the scene while the crimes were committed and leave the scene with the coconspirators"), cert. denied, 269 Conn. 901, 852 A.2d 733 (2004).

The defendant's conduct and his statements to Chelsea Papineau following the incident not only reflected his consciousness of his guilt, but strongly bolstered a finding that he intended for the victim to sustain serious physical injury and that he had been an active participant with Whittington in a preplanned retaliatory event.

"Although mere presence at a crime scene, standing alone, generally is insufficient to infer an agreement, a defendant's knowing and willing participation in a conspiracy nevertheless may be inferred from his presence at critical stages of the conspiracy that could not be explained by happenstance . . . ." (Internal quotation marks omitted.) *State* v. *Rosado*, 134 Conn. App. 505, 511, 39 A.3d 1156, cert. denied, 305 Conn. 905, 44 A.3d 181 (2012). The defendant's actual participation in the assault and his conduct following the assault undermines his argument that he merely was a bystander during the events at issue. The defendant

relies almost exclusively on Whittington's testimony. In accordance with our well settled standard of review, we focus on the evidence that supported the jury's finding of guilt. The defendant attempts to portray Whittington as the sole perpetrator, yet the evidence of the defendant's conduct before, during, and after the events at issue reflect that he and Whittington conspired to cause serious physical injury to the victim by means of a dangerous instrument. See *State* v. *Williams*, 94 Conn. App. 424, 433, 892 A.2d 990 (defendant's conduct before, during, and following incident may shed light on his state of mind), cert. denied, 279 Conn. 901, 901 A.2d 1224 (2006).

In light of the foregoing, we reject the defendant's argument that the evidence was insufficient to convict him of conspiracy to commit assault in the first degree.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The court granted the defendant's motion for a judgment of acquittal with respect to one count of hindering prosecution in the second degree in violation of General Statutes § 53a-166.

The court imposed a total effective sentence of fourteen years imprisonment, five years of which are mandatory, followed by six years of special parole.

[2] Unless, for clarity, we refer to Joshua Whittington by his full name, generally we will refer to him in this opinion as "Whittington."

[3] Whittington testified for the defense. His version of events was that he became angry with the victim because he believed that, on a prior occasion, the victim took money from him and the defendant. He testified that he alone physically attacked the victim with a baseball bat in the mill, that it was a "spur of the moment" decision on his part, and that the defendant, who was present with him and the victim in the mill, fled the scene without harming the victim. He testified that after he had struck the victim several times, the defendant attempted to take the bat away from him. He and the defendant struggled briefly, but he ordered the defendant to "get [the] heck out of there" and "gestured that [he] was gonna hit him next."

[4] As modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015), the *Golding* doctrine provides that "a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." (Emphasis omitted; footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40.

"The defendant bears the responsibility for providing a record that is adequate for review of his claim of constitutional error. . . . The defendant also bears the responsibility of demonstrating that his claim is indeed a violation of a fundamental constitutional right. . . . Finally, if we are persuaded that the merits of the defendant's claim should be addressed, we will review it and arrive at a conclusion as to whether the alleged constitutional violation . . . exists and whether it . . . deprived the defendant of a fair trial." (Citations omitted.) Id., 240–41.

[5] "When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . [A] nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict. . . . [Our] determination [of whether] the defendant was harmed by the trial court's . . . [evidentiary ruling] is guided by the various factors that we have articulated as relevant [to] the inquiry of evidentiary harmlessness

. . . such as the importance of the . . . testimony [to the defense], whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony . . . on material points . . . and, of course, the overall strength of the state's case. . . . Most importantly, we must examine the impact of the evidence on the trier of fact and the result of the trial." (Internal quotation marks omitted.) *State* v. *Rodriguez*, 311 Conn. 80, 89, 83 A.3d 595 (2014).

[6] In evaluating a claim of this nature, "[w]e first review the trial court's evidentiary rulings, if premised on a correct view of the law . . . for an abuse of discretion. . . . If, after reviewing the trial court's evidentiary rulings, we conclude that the trial court properly excluded the proffered evidence, then the defendant's constitutional claims necessarily fail. . . . If, however, we conclude that the trial court improperly excluded certain evidence, we will proceed to analyze [w]hether [the] limitations on impeachment, including cross-examination, [were] so severe as to violate [the defendant's rights under] the confrontation clause of the sixth amendment . . . . In evaluating the severity of the limitations, if any, improperly imposed on the defendant's right to confront, and thus impeach, a witness, [w]e consider the nature of the excluded inquiry, whether the field of inquiry was adequately covered by other questions that were allowed, and the overall quality of the cross-examination viewed in relation to the issues actually litigated at trial. . . . In conducting our analysis, we are mindful that trial judges retain wide latitude insofar as the [c]onfrontation [c]lause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. . . . [W]e have upheld restrictions on the scope of cross-examination where the defendant's allegations of witness bias lack any apparent factual foundation and thus appear to be mere fishing expeditions. . . . We consider de novo whether a constitutional violation occurred." (Citations omitted; internal quotation marks omitted.) *State* v. *Halili*, 175 Conn. App. 838, 852–53, 168 A.3d 565, cert. denied, 327 Conn. 961, 172 A.3d 1261 (2017).

[7] Presumably, in referencing a proffer, the defendant relies on what Denise Papineau stated following defense counsel's question.

[8] See footnote 4 of this opinion.

[9] Prior to the presentation of evidence, the court instructed the jury in relevant part: "Now, during the trial, counsel on each side may object when the other side offers testimony or evidence which counsel believes is not admissible . . . . If, during the course of the trial, the court sustains an objection by one attorney to a question asked by the other, you should disregard the question, and you must not speculate as to what the answer would have been. So, also, if any testimony is ordered stricken, you should disregard that testimony and must not give it any weight whatsoever in your deliberations."

[10] During its charge, the court instructed the jury that it was to consider the evidence, including the sworn testimony of witnesses, and that "any testimony that has been excluded or stricken" was not evidence.

[11] Following the evidentiary ruling, it would have been better practice for the court sua sponte to have ordered that the witness' answer be stricken from the evidence or for the prosecutor to have moved to strike the answer after he had obtained a favorable ruling. Such steps would have provided a greater degree of clarity for the jury and for this court in its evaluation of the evidence.

[12] We observe that the excluded evidence at issue in the present claim did not tend to refute the other highly incriminating consciousness of guilt evidence that was presented by the state, which demonstrated that the defendant, fearing arrest on an attempted murder charge, planned to relocate to Ohio for at least five years. This other consciousness of guilt evidence, as well as the fact that the defense was permitted to present ample evidence concerning the defendant's plans to travel to Cape Cod, leads us to conclude that, even if the court erroneously precluded the narrow inquiry at issue in this claim, such error was harmless beyond a reasonable doubt under *Golding*'s fourth prong. See footnote 4 of this opinion.

[13] In light of our determination that the excluded evidence was cumulative of other evidence that the defendant was permitted to present to the jury, we are not persuaded that the court's ruling reflected that a serious and manifest injustice occurred in the present case. Accordingly, we reject the defendant's recourse to the plain error doctrine. See *State* v. *Myers*, 290 Conn. 278, 289, 963 A.2d 11 (2009) (discussing appellant's burden to satisfy plain error doctrine).

[14] There are fifteen incoming text messages in the document and seven outgoing text messages. One of the incoming messages dated, "Yesterday 2:53 PM," states: "Hey I can't make it to my mom's today. I'll try to figure something out." Another incoming text, dated "Today 4:21 PM," states: "Hey do you have corby's number? And so u don't worry were keeping the phone off w the SD card out unless we have to use the phone." An outgoing text message replies, "Why do u want it?" An incoming message states, "Call me and ill talk to you." The last incoming message states: "Just remember to delete ur messages."

[15] A review of the subject matter of the text messages reflects that, in part, they concerned the topic of the defendant's children with Chelsea Papineau.

[16] We observe that, following the state's prima facie showing of authenticity, arguments concerning the authorship of the text messages were fodder for the jury's consideration. As our review of the facts underlying this claim reveals, defense counsel availed himself of an opportunity to challenge the state's evidence by eliciting testimony during his cross-examination of Chelsea Papineau to establish that the text messages came from Whittington's telephone and that she did not physically observe the defendant using Whittington's telephone to send her the messages at issue.

[17] At trial, the defendant moved for a judgment of acquittal with respect to this charge. The court denied the motion.

[18] The victim testified that, once he, the defendant, and Whittington were inside the mill, he was using a flashlight, and that the defendant and Whittington were using "a flashlight that was . . . on their phone." The victim testified that, after he was struck by the baseball bat, he dropped his flashlight. He testified that, both prior to and following the time that he was struck, the defendant was using a cell phone light and that "[t]hat light never went out." He testified that that light source was shining on him while Whittington was striking him repeatedly. Thus, it would have been reasonable for the jury to find that the defendant illuminated the victim while Whittington struck him.

[19] Considering the undisputed evidence that Whittington struck the victim in the back of the head with a baseball bat and continued to assault him with the bat in the poorly illuminated mill, it is understandable that the victim was unable to shed much light on which of his assailants had stabbed him. The victim testified, in relevant part: "As I turned my head . . . I was hit in the head with a baseball bat numerous times. I was trying to get away. Being pushed toward the darker part of the mill, I then felt like I was being stabbed. All the time asking . . . why is this happening? What are you guys doing? And then I was pushed into a hole."

[20] Whittington testified, in part, that, following the events in the mill, he tried to conceal his actions in the mill by washing his boots in a river and that the defendant washed his boots in the river, as well.

[21] The defendant argues that he and Whittington did not have a motivation to conspire against the victim on the basis of the stolen money because Whittington did not learn that the victim had stolen the money until seconds prior to the assault. This is not an accurate view of the evidence. First, we observe that, although the defendant denied any involvement in the assault and told the police that he "never had any problem with [the victim]," he nonetheless stated that he had "heard rumors about [the defendant] robbing people who he was staying with in the past." Both the victim and Chelsea Papineau testified that the victim had stayed with the defendant in the past.

Second, during direct examination by defense counsel, the following examination of Whittington occurred:

"Q. And so did something happen between you and [the victim inside of the mill]?

"A. We—I discussed with him because I was told by a mutual friend, Kevin—I don't know his last name, but *he told me that* [*the victim*] *had taken my money before*, so I confronted [the victim] about it and I kept at him, and I got closer to him and asked him, you know, if he took my money. He finally admitted to me he did, and I got angry and I got up in his face. He kind of tried to push me away and I snapped, and I had hold of a bat and I hit him in the head with the bat and when he had fell over, I kept hitting him.

"Q. Let me . . . stop you right there. Now, before that, had there been any discussion about the money?

"A. *He knew we were missing the money* and we weren't thinking it was him at the time, so there was no real big discussion about it.

"Q. Did . . . you and [the defendant] . . . have any discussions about trying to get [the victim] . . . or try to hurt him or anything like that?

"A. No. *We actually found out that day* it was . . . that *we were told that day* it was him when we were meeting back up with him at [Sunnyside Farms] by our mutual friend.

"Q. But was there any plans to . . . get revenge or anything like that?

"A. No. We . . . had no plans. It was spur of the moment." (Emphasis added.)

The jury could accept or reject Whittington's testimony in whole or in part. Setting aside Whittington's testimony that he and the defendant had not planned to retaliate against the victim, a reasonable view of Whittington's testimony reflects that, in the hours prior to the attack, the defendant and Whittington learned information from a third party that caused them to strongly suspect that, on a prior occasion, the victim had stolen money from them. Whittington's testimony reflects that he aggressively confronted the victim and became violent once he had obtained a confession from the victim.

[22] The defendant attempts to undermine a finding that any planning occurred by relying on the undisputed evidence that the victim first suggested that the three men spend the night in the abandoned mill. Simply because the victim first suggested that the men spend the night in the mill does not make it any less plausible that, during the afternoon hours of December 22, 2014, the defendant and Whittington had ample time in which to conspire to assault the victim therein.

--------